Arthur Gr. Kleih, J.
The Corporation Counsel of the City of New York, together with the District Attorneys of the five counties comprising said city, seeks, pursuant to section 22-a of the Code of Criminal Procedure, to enjoin the publishing, acquiring, selling or distributing of a certain book entitled “ John Cleland’s Memoirs of A Woman of Pleasure” (commonly known as “ Fanny Hill ”) (plaintiffs’ Exhibit No. 1 in evidence) hereinafter referred to as “Memoirs”, or “the book.” The book in question (Library of Congress catalog card No. 63-9656) is published by defendant Gr. P. Putnam’s Sons, conceded by plaintiffs to be an old-established, reputable publishing firm. Both sides have waived findings of fact and conclusions of law. The action has been discontinued, without costs as against the other defendants.
Section 22-a of the Code of Criminal Procedure provides, in part, in subdivision 1, that the District Attorney of any county may maintain an action to enjoin the sale, distribution, etc., of any book, magazine, etc., “of an indecent character, which is obscene, lewd, lascivious, filthy, indecent or disgusting”. Subdivision 2 of said section provides: “ The person, firm or corporation sought to be enjoined shall be entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days of the conclusion of the trial.”
Pending the present trial, a temporary injunction was granted by this court (40 Misc 2d 25 [Marks, J.]). The granting of the injunction pendente lite served, as does every temporary stay, only to hold the matter in status quo pending a determination on the merits and the granting of the temporary injunction can in no wise be considered an adjudication on the merits. “ [T]he issues must be tried to the same extent as though no temporary injunction had been applied for ” (Walker Mem. Baptist Church v. Sanders, 285 N. Y. 462, 474).
The publication of “ Memoirs ” is herein sought to be suppressed on the ground of its alleged obscenity. Since no two books are exactly alike, each book must be separately judged and from an examination of the leading cases on the subject, *30 it is apparent that there exists no automatically controlling precedent.
The United States Supreme Court has set up several standards by which a book is to be judged, and it is well settled that a book must fail when judged by these standards before it may be suppressed.
Two of these tests were announced in Roth v. United States (354 U. S. 476), and a third in Manual Enterprises v. Day (370 U. S. 478). Still another test was formulated by our Court of Appeals in People v. Richmond County News (9 N Y 2d 578).
The tests are as follows:
(1) The “ social value ” test. The core of the opinion in the leading case is found in the following language: ‘ ‘ All ideas having even the slightest redeeming social importance — unorthodox ideas, controversial ideas, even ideas, hateful to the prevailing climate of opinion — have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance.” (Roth v. United States, 354 U. S. 476, 484.)
(2) The “prurient interest” test. “However, sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest. The portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern. * * * ‘ A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters.7 77 (Roth v. United States, supra, p. 487.)
(3) The “ patently offensive 77 test. “ These magazines cannot be deemed so offensive on their face as to affront current community standards of decency— a quality that we shall hereafter refer to as ‘ patent offensiveness 7 or ‘ indecency.7 Lacking that quality, the magazines cannot be deemed legally * obscene,7 and we need not consider the question of the proper ‘ audience 7 by which their ‘ prurient interest7 appeal should be judged.” (Manual Enterprises v. Day, 370 U. S. 478, 482.)
(4) The “hard-core pornography 77 test. “ The inquiry for the court, therefore, is whether the publication is so entirely *31 obscene as to amount to ‘ hard-core pornography ’ (not necessarily dealing with deviate sex relations since while there is a pornography of perversion, 1 pornography ’ is not limited to the depiction of unnatural acts).” (People v. Richmond County News, 9 N Y 2d 578, 589, supra.)
While the standards or tests are clearly defined, their application presents considerable difficulty; witness, for example, the case involving Henry Miller’s “ Tropic of Cancer ”. This book has been held obscene in the 9th Circuit Federal Court of Appeals (Besig v. United States, 208 F. 2d 142), in the State of Connecticut (State v. Huntington, 1962, No. 24657, Superior Court, Hartford County) and in the State of Pennsylvania (Commonwealth v. Robin, 1962, No. 3177, Ct. of Common Pleas, Phila. County), while at the same time it has been held to be not obscene by the courts of Massachusetts, Wisconsin and Illinois (Attorney General v. Book Named “Tropic of Cancer”, 345 Mass. 11; McCauley v. “Tropic of Cancer”, 20 Wis. 2d 134); Haiman v. Morris, 1962, No. 61 S 19718, Superior Court, Cook County, Illinois). On July 2,1963, the highest court of the State of California declared the book not obscene (Zeitlin v. Arnebergh, 59 Cal. 2d 901); yet, within 10 days after the seven members of that court had unanimously rendered their judgment, the highest court of our State in a four-to-three decision (People v. Fritch, 13 N Y 2d 119) declared the book to be obscene.
So zealously is the constitutional right to freedom of expression guarded that the section under which the present action has been brought (Code Grim. Pro., § 22-a) contains two unique provisions not to be found in any other statute: (1) that the party sought to be enjoined shall be entitled to a trial of the issues within one day after joinder of issue, and (2) that a decision shall be rendered within two days after the conclusion of the trial.
The book, though undeniably containing numerous descriptions of the sex act and certain aberrations thereof as its central theme, contains not one single obscene word. While it is undoubtedly true that obscenity is not rendered less obscene by virtue of the fact that it has been well written — nor for that matter must a writing necessarily appear exclusively on the walls of men’s public lavatories to be considered pornographic — there is present herein an additional factor, not normally encountered in cases where books are sought to be suppressed, and that is the high literary quality of the book. With respect to the literary quality of the book, defendant produced several expert literary figures as witnesses who testified at some length.
The witnesses, all highly qualified and eminent in their field, included J. Donald Adams, writer, publisher, presently a con *32 tributing editor to the New York Sunday Times Book Review, with which he has been associated for 40 years, 18 of which were as editor of said book review; John Hollander, poet, assistant professor of English literature at Yale University, book reviewer for many literary quarterlies, the New York Times, Neiv York Herald Tribune, London Guardian and London Sunday Times-, Louis Untermeyer, well-known writer, poet and literary critic; G-erald Willen, formerly chairman of the department of English, Fairleigh Dickinson University, and presently assistant professor of English at Hunter College; and Eric Bentley, teacher of dramatic literature and chairman of the program of the arts at Columbia University.
These witnesses were of the unanimous opinion that the book had great literary merit. Their testimony characterized the book as an historical novel (to a limited extent), containing passages not normally included in a book written solely to arouse passions, and their praises ranged from “ extremely interesting ” to “ skillful ”. In addition, Mr. Untermeyer testified that the book contained the three great attributes of a good novel: (1) treatment of the subject matter with grace and beauty; (2) skillful and eloquent charm of writing; and (3) characters coming to life. He characterized the book as a “ work of art ”. Plaintiffs did not produce a single literary expert to rebut the foregoing testimony.
Although the instant action is brought pursuant to the Code of Criminal Procedure, it nevertheless is in the nature of a civil proceeding. While plaintiffs need not, therefore, establish their allegations beyond a reasonable doubt, in order to prevail herein, they must, as in every civil action, nevertheless establish their case by a fair preponderance of the evidence. The burden is therefore upon them to establish by such preponderance of evidence that the defendant has caused to be published, distributed, etc., a book not encompassed within the orbit of constitutional protection. In applying these recognized standards, it is the court’s opinion that the plaintiffs have failed to sustain that burden of proof sufficiently to entitle them to judgment in this ease.
Under the “ social value ” test referred to in Roth v. United States (354 U. S. 476, supra), the expert testimony adduced at the trial indicates, and the court so finds, that the book herein sought to be suppressed is an historical novel of literary value. While each book must necessarily be evaluated on its own individual worth, of interest, nevertheless, is the opinion of defendant’s witness, Eliot Fremont-Smith, an editor of the book review *33 section of the New York Sunday Times, who testified that with respect to the depiction of the act of sex, the book involved in this action does not exceed the limits of candor which have been established by the publication and acceptance of books sold through reputable book stores and reviewed in reputable publications during the past several years. In addition, the court takes judicial notice of the fact that many books in circulation today contain much offensive language.
With respect to the “prurient interest” test enunciated in Roth v. United States (supra), taking the book as a whole and not just those portions thereof which appeal to the salacious page-turner, plaintiffs, here, too, have failed to sustain the burden of proof.
Under Manual Enterprises v. Day (370 U. S. 478, supra), in addition to the “ prurient interest ” test, to warrant a suppression of the book, plaintiffs must establish that the challenged material is ‘1 patently offensive ’ ’ to current community standards of decency.
If the standards of the community are to be gauged by what it is permitted to read in its daily newspapers, then Fanny Hill’s experiences contain little more than what the community has already encountered on the front pages of many of its newspapers in the reporting of the recent “ Profumo ” and other sensational cases involving sex.
If the standards are to be measured by what the public has of late been permitted to view in the so-called “foreign art ” movies, and, indeed, some of our domestic products, then it is equally clear that “ Memoirs ” does these standards no violence whatsoever. “ The community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates.” (Smith v. California, 361 U. S. 147, 171.)
The book can in no manner whatsoever be characterized as “patently offensive” when examined in the light of current community standards.
In a ease involving a violation of section 1141 of the Penal Law (sale, etc., of obscene literature, etc.) the Court of Appeals held such section applicable only to material which may properly be termed “hard-core pornography ” (People v. Richmond County News, 9 N Y 2d 578). In the 214 years that have elapsed since “Memoirs” was first published in 1749, the book has been in constant, though for the most part surreptitious, circulation and has been translated into every major European language. Copies of the novel are to be found in the British Museum and Library of Congress. Benjamin Franklin is *34 reputed to have had a copy in his library. The New York Public Library’s copy of the novel indicates in its inscription that same once belonged to Governor Samuel J. Tilden. Of the author and the book it has been said: “ While Dr. Johnson lived in Gough Square, while Edward Gibbon was yet a boy, long before William Wordsworth was born, an obscure and harassed Englishman turned out a book which, to judge from the fascination it still holds for a great variety of readers, is more nearly immortal than anything these and the other great men of the time ever wrote.” (Balph Thompson, “ Deathless Lady ”, The Colophon: A quarterly for Bookmen, 1935, Yol. I.) Were the book “ hardcore pornography ”, “dirt for dirt’s sake”, or “dirt for money’s sake”, it is extremely doubtful that it would have existed these many years under the afore-mentioned circumstances. Here, too, then, the plaintiffs have failed to establish their case by a fair preponderance of the evidence.
In view of all of the foregoing and upon a careful reading of the book, it is the court’s view that same is not of such a nature as to warrant the drastic relief sought herein.
While parents would not like the book to be read by their young children, this hardly constitutes a legally sufficient ground upon which to predicate a constitutional judgment that the book is not entitled to the protection of the First Amendment. As was pointed out by Mr. Justice Frankfurter on behalf of a unanimous court in Butler v. Michigan (352 U. S. 380): “It is clear on the record that appellant was convicted because Michigan, by § 343, made it an offense for him to make available for the general reading public (and he in fact sold to a police officer) a book that the trial judge found to have a potentially deleterious influence upon youth. The State insists that, by thus quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence, it is exercising its power to promote the general welfare. Surely, this is to burn the house to roast the pig. * * * The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual, now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensable conditions for the maintenance and progress of a free society.”
While the saga of Fanny Hill will undoubtedly never replace “ Little Bed Biding Hood ” as a popular bedtime story, it is quite possible that were Fanny to be transposed from her mid-eighteenth century Georgian surroundings to our present-day *35 society, she might conceivably encounter many things which would cause her to blush.
The complaint is dismissed, the temporary injunction is vacated, and judgment is directed for the defendant.