J. Irwin Shapiro, J.
Motion by the defendants í ‘ for an order directing the District Attorney of the County of Queens to permit the defendants, or their representatives, to inspect the minutes of the Grand Jury which presented to this court the said indictment hereinabove referred to or, in the alternative, to dismiss the said indictment on the ground that the same is contrary to the law, illegal and invalid in that the same was not founded upon sufficient or adequate evidence and that the same is and was violative of the constitutional rights of the defendants, more particularly, but not confined to the violation of the defendants’ rights under the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution ”.
The defendants are charged in a nine-count indictment with violating section 1141 of the Penal Law (“ Obscene prints and articles ”), and with conspiracy to violate that statute, in that they did sell and distribute the eight books mentioned therein.
It is now well settled, despite illuminating dissenting opinions to the contrary, that State statutes making it a crime to publish or distribute writings “ incontestably found to be obscene ” do not invade the freedom of expression guarantees contained in the *627 First Amendment of the United States Constitution (Kingsley Books v. Brown, 354 U. S. 436, 440; Roth v. United States, 354 U. S. 476, 481; Alberts v. California, 354 U. S. 476; People v. Richmond County News, 9 N Y 2d 578, 581), but such statutes must be narrowly and strictly construed (People v. Richmond County News, supra, p. 581).
“ [I]f ‘ obscenity ’ is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional judgment of the most sensitive and delicate kind” (Harlan, J., in concurring opinion in Roth v. United States, 354 U. S. 476, 497-498).
In order to pass upon that “ most sensitive and delicate question ” of “ constitutional judgment ”, I have of necessity been compelled to read all eight books, a short synopsis of each of which is set forth as an exhibit to this opinion.
The literary value of these books may be nil, but that does not mean that they may therefore constitutionally be suppressed or that their authors or distributors are criminals. A public official, albeit a Judge, who determines what is and what is not hard-core pornography becomes a censor but the law in its present state requires just that. Undertaking that distasteful task, as I must, requires an evaluation of the stories in these books in relation to our present society and culture. The basic question is whether these books go beyond “ the present critical point in the compromise between candor and shame at which the community [has] arrived” (United States v. Kennerley, 209 F. 119, 121, cited with approval in People v. Richmond County News, 9 N Y 2d 578, 586, supra).
The books contain a great number of descriptions of sexual activity which, in many cases, are only tenuously associated with the plot and story line. They thus, no doubt, provide erotic reading material, but no more so than many works of literature which have received acclaim as classics. In that connection it should be remembered that the fact ‘1 that adulterous or other sexually immoral relationships are portrayed approvingly cannot serve as a reason for declaring a work obscene without running afoul of the First Amendment ” (People v. Richmond County News, supra, p. 582) because the Constitution protects “ advocacy of the opinion that adultery may sometimes be proper, no less than advocacy of socialism or the single tax ” (Kingsley Pictures Corp. v. Regents, 360 U. S. 684, 689).
Writings which have received favorable recognition in all types of civilizations, in all ages, have delineated societies’ cultures and the relationship of the individual to them. Throughout the annals of recorded history, there have been writers who *628 failed to achieve the higher plateaus of literature and art. Their failure to achieve literary recognition does not thereby make their works more objectionable, legally or morally, than that of the writer who merits, or receives, the high acclaim of the critical community for his literary style and grace (Winters v. New York, 333 U. S. 507, 510; People v. Fritch, 13 N Y 2d 119).
The civilizations of the past provide the basis for our modern culture and society. Literature — good, bad and indifferent — has been the tissue which formed the umbilical cord nurturing all societies from Homeric Greece to the present. The passage of time has seen honors bestowed upon authors whose writings are replete with words and incidents that were deemed lurid and pornographic contemporaneously with their appearance. Aristophanes, Plautus, Shakespeare, Brinsley, Swift, Boccaccio, Rabelais and Balzac, to name just a few, are now noted and recognized for the vigor of their writings and for the artful way in which they delineated and portrayed the ethical and moral conditions of their times. They were not always so regarded, however, and many of their works were attacked and ridiculed by those of tender sensibilities upon the same basis that the finger of accusation is pointed at the books here under scrutiny.
Nothing is truer than that with the passage of time we constantly see a reshuffling of the gods in the world’s literary pantheon. We should therefore proceed with the utmost caution before determining, as a matter of constitutional judgment, that those who write about the serpent in Eden, in their own way, should have their writings banned and that they themselves should be denominated criminals.
Words which are not in use (supposedly) in polite society and are denoted as ‘1 four letter ’ ’ words do not in and of themselves make for obscenity. If they did “ The Arabian Nights ”, just to cite one accepted classic, would require suppression. Many readers may be disgusted or revolted by the use of foul language but the scenes that are depicted thereby are not, in context, necessarily pornographic (United States v. One Book Entitled Ulysses, 72 F. 2d 705, 707; Halsey v. New York Soc. for Suppression of Vice, 234 N. Y. 1, 4).
Most books which have been heretofore attacked as obscene and pornographic, and which have been defended as having over-all literary merit, have presented a problem in research which usually consisted of a detailed search for “ four letter ” words, phrases and descriptions which could be lifted from the text to provide a basis for their indictment as pornographic. The books here offer no such problem for they contain no “ four *629 letter ” words. So far as the purity of the language used is concerned the books could well be made required reading for fourth-year elementary students. Fully 90% of each book, however, is filled with lurid descriptions of sexual activities, both hetero and homosexual, in sufficient detail to act as an erotic stimulus to those so inclined. However, in all their erotic descriptions they maintain a clever, and apparently deliberate, avoidance of socially unacceptable language, and the descriptions of erotic activity are so similar, in language and action, as to appear to be written by one author using one outline for all the books. Even those books which have a stronger plot and story, line reflect this outline in the description of the sexual scene. Page after page contains details and descriptions of similar erotic behavior. In that respect they remind one of the similarity of all the Horatio Alger stories of this court’s youthful days except that the latter dealt with the rise from “ Bags to Biches ” and these books deal with the march from ‘1 Puberty to Prostitution ”.
In the opinion of the court (compelled by statute to act as a literary critic) these books are plain unvarnished trash, but novels and stories of no literary merit have a place in our society. There are those who, because of lack of education, the meanness of their social existence, or mental insufficiency, cannot cope with anything better. Slick paper confessions, pulp adventure and “ comic book” type of magazines provide them with an escape from reality. However, the fringes of society are not the only cover for those neurotics unable to satisfy their sexual needs through acceptable outlets. Events of the past and present tell us that. So-called pillars of society number among them men and women whose sexual outlet is the eroticism of literature and pictures designed to relieve their libidinous repressions (see authorities collated by Judge Ftjld in People v. Richmond County News, 9 N Y 2d 578, 583, 584, supra). Many of these people provide a ready, although, no doubt, clandestine market for the pornographic. As Sigmund Freud, the contentious founder of psychoanalysis and one whose own writings many no doubt would like to see suppressed, said in his “ Wit and Its Belation to the Unconscious” “ Common people so thoroughly enjoy such smutty talk, * * * that it is a never lacking activity of cheerful humor ”.
In a pluralistic society, such as ours, censorship is neither truly possible nor, in the opinion of many, either desirable or legal (“ One Man’s Stand for Freedom ”, Hugo L. Black). If the flow of what is considered offensive literature is to be dammed it should be done by the exercise of censorship in the home and *630 not by judicial fiat. Undue legal restraint- must be guarded against since the exercise of censorship tends to feed upon itself and to extend into, and encroach upon, areas of personal liberties which are the very foundation of a free society. We should not attempt to suppress writings dealing with those sorrier aspects of human behavior in our national life that most of us, had we the choice, would change.
G. Rattray Taylor in11 Sex in History ’ ’ discusses the medieval style of nakedness. In his chapter on “ Medieval Sexual Behavior ”, he describes a scene, in conformity with the practice of those days when outstanding personalities were being honored, in which “ the Queen of Ulster and all the ladies of the Court, to the number of 610, came to meet Cuchulainn, naked above the waist and raising their skirts so as to expose their private parts, by which they showed how greatly they honored him.”
Just as the pendulum of public taste and manners has swung far away from such presently considered crude behavior, it has also swung far past the repressions of prurient and prudish Victoria. Today, skirts are shorter and the outlined erogenous areas of women are taken matter-of-factly. The undergarment model has dropped the mask from her eyes and looks at you slyly as she displays the advantage of any-brand’s bra and girdle in advertisements published by ladies’ magazines and our most respected newspapers, and in telecasts coming into the home. These media reflect the trends of the times. In addition, many children are dressed in suggestive clothing, the boys in skin tight trousers and the girls in revealing bodily outlines; the adolescent drives the family car, with his girl friend, to a drive-in movie where they see sex comedies which make light of premarital and extramarital sexual relations. Sex and sophistication surround them. A single page of one of our metropolitan newspapers contains reviews or advertisements of a number of motion pictures variously described as follows: “ a romp of bawdy tales completely in the Gallic tradition that sex dalliance is the funniest topic on earth ”; “ loaded with burlesque seductions, orgies ’ ’ and a description of the actress “ who plays the mistress ”; “ a bold, sexy, disquieting film
Such, whether we approve or disapprove, is the temper of our times and it is in that light that one must determine whether the books here are obscene for “ the community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates ” (Smith v. California, 361 U. S. 147, 171).
It is of the utmost importance in this field that Judges be not motivated to assume the guise of censors by reason of personal *631 predilections, and that decisions be not dictated by their personal whims with little consideration given to the fact that liberty is not divisible and that when we deny its privileges to others we place our own in jeopardy, or by pressure subconsciously exerted by groups of well-meaning vigilante guardians of the public morals who often refuse to recognize that free societies are dynamic and that literature and art, and badly written books too, are merely the mirror reflections of some phase of existing life. Truth, so evidenced, is often bitter and distasteful, but so are many facets of our existence for there is a “ huge and disproportionate abundance of evil ” on earth (Ealph Waldo Emerson in his Journal).
Totalitarian dictated monotonous conformity in the use of the written word is too great a price to pay to receive the approbation of the ultrasensitive or the easily psychically devastated. Writing can reflect the changes which are taking place in a culture or they may lead a society to change. What is good or bad in the past or present, or may be in the future, is described by perceptive writers in various ways and many dialects.
If any of these eight books truthfully picture any considerable segment of our society, we may be doomed to the same destruction which befell the hedonistic, voluptuarian civilizations of G-reece and Eome and Hamlet’s disillusionment and disgust with the world as being ‘1 no other thing than a foul and pestilent congregation of vapors ” could find little dissent.
However, whether the word portraits painted in these eight books are an accurate recital of existing conditions or are pure fantasy, to attempt to blot out the portrayal by judicial censorship would be completely unavailing, just as the book burners of old did not by the flames of their fires succeed in consuming the truth contained in those books. Any such attempted prohibition of books, in the long run, will be no more effective than our last noble experiment, the liquor prohibition amendment.
I venture the opinion that the recent unsuccessful attempt to suppress “ Memoirs of a Woman of Pleasure ” (popularly known as “ Fanny Hill”) (Larkin v. Putnam’s Sons, 40 Misc 2d 25, Klein, J.) and the free advertising received by the book in connection therewith will see more copies of it sold this year than have been printed in its 214 years of clandestine existence.
In an era of bikinis, which reveal more than they conceal; of cinemas which show females swimming in the nude and which have for their main thesis the art of living well by prostitution and pimping and of newspapers which contain complete and detailed descriptions of the actions of the sexually aberrant, one must legally conclude that these books in the mores of these *632 days, do not constitute hard-core pornography. Coarse they are, but so is much in our civilization.
To censor these books, by law, would be flowering the seed of the repression of free expression. If books such as these are to be suppressed, it should not be done by law, but by the starvation of those who write and distribute them through the failure of the public to purchase them. Education, and not judicial legislation, is the answer. In the words of Plato (The Republic, Ch. XI) “It would be silly, I think, to make laws on these matters ”. Voluntary censorship, exercised by the would-be purchaser of such material, is the essence of a free society — a society which has more to lose from unbridled censorship than from prohibiting the publication of “gamy” books. That is one of the main differences between worlds that are open and worlds that are closed. In the final analysis we must trust in the good sense of the people. They should be the sole judges of whether they are going to be literary gourmets, gourmands or gluttons for what is “ one reader’s obscenity is another’s artistry” (New York Times, editorial, Aug. 24, 1963).
In People v. Richmond County News (9 N Y 2d 578, supra), an attempt to censor a magazine was involved. It contained numerous pictures of “ nude or partially nude women many of which are clearly sexually suggestive ”. One picture portrayed “ a totally nude woman just starting to slip on an undergarment and saying to another nude woman whose nakedness is reflected in a mirror on the wall ‘ I had better leave now — before my husband comes home ’ ” which Judge Fboessel in his dissenting opinion said (p. 594) “ clearly and openly imports lesbianism — ‘ a debauchery of the sexual faculty ’ ”. In discussing an article on page 7 of that same magazine which dealt with an experience between a married man and a young woman, Judge Fboessel said (p. 594): “It tells how, while walking to her apartment, he ‘ absorbed the view of her breasts standing out in bold relief. In his haziness, he pictured her naked from her fleshy shoulders to her liquid underbelly ’ (p. 9, col. 1). Then later, she ‘ expertly worked [her hand] down his body. Her palm pushed in his belly slightly * * *. Her breathing was louder now, and she wriggled to get into a more erotic position ’ (p. 9, col. 2). On page 10: he ‘ let his finger toy with her nipples until they stood up like pencil erasers. He grabbed her, and drove his tongue to the roof of her mouth. She did it back, and soon they were rubbing and kissing and feeling, and undressing each other. They thrashed on the bed until their rhythmic animal convulsions propelled them to the floor ’.
*633 “In another article entitled ‘ Outline for an Anthropological Disquisition ’ (at p. 53), the author describes a somewhat similar experience, and apologizes for his brutality but is invited by the woman to be more brutal next time. ’ ’
The majority of the Court of Appeals, however, held that the magazine could not be constitutionally proscribed. In giving his reasons for concurrence in that conclusion, Chief Judge Desmond said that the magazine was not pornographic (p. 589) “ using that term as describing the extreme form of gross and all-intentioned sexuality which American statutes and courts may constitutionally punish as criminal ’ ’ and he concluded that, “ [t]his collection of sexy fiction and illustrations has little of literary merit or artistry and yet it is not in the First Amendment sense filthy or disgusting or deliberately corruptive or offensive to common decency under prevailing standards of taste.”
If the decision in that case is the law of this State today, the books here under review are constitutionally protected against suppression and do not violate section 1141 of the Penal Law. True it is that teen-agers may be hurt by reading what may very well be denominated as vulgar trash, but the effect upon and the reactions of children are not legally valid tests to determine what constitutes illegal pornography (Roth v. United States, 354 U. S. 476, 489, 490, supra).[1]
In Butler v. Michigan (352 U. S. 380) the Trial Judge found as a fact that the book there under consideration would ‘ ‘ have a potentially deleterious influence upon youth”. In denying *634 the right to suppress that book despite that factually well-founded finding, Mr. Justice Frankfurter, declaring the Michigan statute unconstitutional because it made such a book unavailable to the general reading public, said (pp. 383-384): ‘1 The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensable conditions for the maintenance and progress of a free society.”
In People v. Fritch (13 N Y 2d 119, 124) the Court of Appeals by a sharply divided court held that the book ‘ ‘ Tropic of Cancer ” came within the ban of the pornography statute. That determination is not here in point, for as the majority opinion of Judge Scileppi points out: “ Throughout its pages can be found a constant repetition of patently offensive words used solely to convey debasing portrayals of natural and unnatural sexual experiences” and in footnote 5 to his opinion Judge Scileppi indicates the pages on which the “ [o]bscene and filthy passages are to be found ”. By actual count they exceed 300 in number, and according to the concurring opinion of Chief Judge Desmond the book “ (on about half its pages by count) is crowded with filth ” (p. 128). The decision in that case, therefore, stands upon its special facts and is to be restricted in its application to the type of book using the kind of language that directly comes within the confines of that opinion.
The eight books[2] here are to me, as an individual, poor writings, bad in taste, profane, offensive and disgusting but they are not obscene within the meaning of section 1141 of the Penal Law as that section must be constitutionally construed in light of the free press guarantee of the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution.
It follows, therefore, that the indictment must be and it is hereby dismissed.

. It should be noted that section 484-h of the Penal Law, effective in its present form, as of September 1, 1963 gives the People a remedy in the case of books such as are here under consideration when sold or given or shown “to any person under the age of eighteen (18) years.” It reads as follows: “ A person who willfully or knowingly sells, lends, gives away, shows, advertises for sale or distributes commercially to any person under the age of eighteen (18) years or has in his possession with intent to give, lend, show, sell, distribute commercially, or otherwise offer for sale or commercial distribution to any individual under the age of eighteen (18) years any pornographic motion picture; or any still picture or photograph, or any book, ‘pocket book’, pamphlet or magazine the cover or content of which exploits, is devoted to, or is principally made up of descriptions of illicit sex or sexual immorality or which is obscene, lewd, lascivious, filthy, indecent or disgusting, or which consists of pictures of nude or partially de-nuded figures, posed or presented in a manner to provoke or arouse lust or passion or to exploit sex, lust or perversion for commercial gain or any article or instrument of indecent or immoral use shall be guilty of a misdemeanor.
“ For the purposes of this section ' knowingly ’ shall mean having knowledge of the character and content of the publication or failure to exercise reasonable inspection which would disclose the content and character of the same.”

. “ Sex Kitten” by Greg Caldwell, “ Clip joint Cutie” by Monte Steele, “ The Wild Ones ” by Nell Holland, “ The Hottest Party in Town ” by Sam Hudson, “Passion Pit” by David Spencer, “Bedroom at the Top” by Bruce Raid, “ Butch ” by Andrew -Shaw, “ College for Sinners ” by Andrew Shaw.