Milton Shalleck, J.
Some days before the submission of this matter, I had occasion to visit a local stationery store to buy the 1964 Farmer’s Almanac and a greeting card. It is a large well-lighted store with many modern display racks. I know it to be popular with the teen-agers who attend the high and junior high schools nearby.
As I was browsing through the cards in consummate indecision about a selection, my eye was attracted to a paper back bookrack which was being revolved by a young girl whom I judged to be about 15 years old. When the rack came to a stop and she had made her selection and had walked off, I casually looked at the titles displayed.
But my casualness was soon dispelled; for there, in bold, lurid, mawkish style of print were such titles as “ The Case of the Naked Nympho ”, “Convict Lust”, “Fanny Hill”, “ Love Cult “ Everything but a Husband “ Male Bride ”, “ Secrets of Famous Mistresses ”, “ Single and Pregnant”, “ Sex Trap”, “Feast of Flesh”, “Unusual Sex Practices” and many others. Each of them had photographs or colored drawings of women and men in various degrees of undress, singly or together, posed in a variety of ways intimating or suggesting divers sexual contacts. I was, frankly, astounded.
The lessons of modern advertising methods had not escaped the owner of the store, for interspersed among these books were such paper back schoolbooks (so widely used these days) as “French, 1st Year”, “Biology”, “Regents questions and answers of Intermediate Algebra ”, and “ Ivanhoe.” No school *607 boy or girl, then looking for a school paper back, could overlook these sexual-entitled books. It was indeed good merchandising. Sales must be plentiful among just such young persons, I thought.
I felt constrained to talk to the owner. I asked him why he displayed such obviously purposely entitled pornographic books. His reply was direct and snide: “ Don’t you know, Mister, that the Supreme Court said that it was okay to sell these books? What are you trying to do, be a censor or something? ” I responded that that was farthest from my mind, but I was curious to know why self-discipline did not impel him not to sell them, despite any right he thought he had. He was adamant in his reply: “ So long as it is legal to sell them, I’m going to do so. Why don’t you stop my competitor down the street? If he stops, I will, too. But,” he continued, “ you ought to acquaint yourself with this,” handing me a pamphlet called “Freedom to Bead”, by one Peter Jennison (Public Affairs Pamphlet No. 344, published in May, 1963) of the American Book Publishers’ Council. I did when I reached home.
This tract was hardly impartial. Just as the store owner was less concerned with people than with money, so is the writer of it undoubtedly driven by economic gain. The publishers want to sell books. It is their only interest. If sex will sell them, then the cloak against censorship should protect them from any moral onslaught. That is the theme of the paper. The words written add little to what we already know. However, two excerpts portray its entire tenor. The first: “Another totally unfair aspect of the activities of the censors is their tendency to brand all paperbound books as obscene because of the existence of a few lurid titles on the racks. They choose to ignore the thousands of titles in this format that provide the best in recreational reading and supplementary educational material, serious fiction and non-fiction of the highest literary and scholarly quality” (p. 16). Even perfunctory observation would dictate this to be in reverse. The few paper backs on the shelves I have seen these days are those of “ highest literary and scholarly quality.” The many consist of the “ lurid titles.”
The second: 1 ‘ The relationship between reading and behavior is a subtle one, defying precise definition. At least three assumptions can be demonstrated: a reading impediment or handicap does affect a child’s adjustment adversely; children and young people are more influenced by what they know to be true than what they know to be fictional; and a preoccupation *608 with obscenity or pornography is clearly a symptom of a deeply-rooted psychological disturbance ” (p. 17). (Emphasis sup- . plied.) Is that the justification for the publishers’ right to feed that disturbance ? The logic of it escapes me.[1] And if the constitutional Bill of Bights give complete freedom — unrestrained license — to publishers to ignore all limits of morality, then that logic escapes me too.[2]
In New York there is a noticeable ground swell these days against the continuous sale of such basic pornography — a fact of which this court must take cognizance since the newspapers carry stories almost daily concerning the public efforts[3] made to suppress — not permissible expression (in violation of the Constitution) —but such expression which itself violates constitutional guarantees. The distinction, of course, is at times difficult to find since the real and the illusory do not always have a clear line of demarcation.3A It is, however, the function of a court to find it in protecting equally the accused and the People, and in weighing the relative rights and duties of each.
I have stated the above to allow those involved in the matter before me to understand the setting against which my decision herein has been rendered and to advise them that it was arrived *609 at with the above only as the setting.[4] It was not this factual constraint which dictated the result.
* * *
The matter before me is basically simple. It is a motion to suppress evidence on the ground that the search warrant in each of the five instances was issued in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution.[5] Each of such warrants is thus controverted under said motion. In order to obviate the requirements of section 807 of the Code of Criminal Procedure that evidence be adduced, *610 the District Attorney and defense counsel have stipulated upon an agreed statement of facts, leaving no factual issues to be determined. In that light, therefore, the following facts stated succinctly for the purposes of the motion, are deemed admitted:
CASE No. 1: Joseph hay. Patrolman Viola’s affidavit in support of the warrant stated he had information that “ obscene material is being sold or offered for sale in violation of Section 1141 ” of the Penal Law at the premises involved. He entered the store at 5:15 p.m., on May 10, 1963 and saw many books and booklets, the covers of which had pictures or drawings of females in bondage or being tortured. He purchased one for $4. It was called ‘1 Betty Page in Bondage.” The next day at about 11:45 a.m., he saw “ a similar display of books in said store ” and purchased another book for $4 entitled “Ruthless Treatment of Bound Slaves.” He further alleged that he “has read these books” and attached a copy of each for the court, stating his belief from the above that the property was “ obscene, lewd or indecent ” and was, because of its offer for, or actual, sale was violative of the . statute. The books “ were read hy the Court which issued the search warrant herein.” (Emphasis supplied.)
A search warrant was issued on the above ‘ ‘ proof by affidavit * * * that there is probable cause for believing that certain property ’ ’ at the given address was obscene, lewd or indecent material, and the command was given thereby to make an immediate search of the premises: 1 ‘ ground floor level, including basements and storerooms therein ’ ’ and if such property is found the police officer was directed to bring it to the issuing court.
The warrant was executed several days later, after the purchase of another copy of “ Betty Page in Bondage,” and “ 102 books which he states were of a similar nature which were on display” were seized and he also removed “ * 12 copies of similar books ’ from behind a counter.” The arrest of the defendant followed.
CASE No. 2: harold zucker. Similar to Case No. 1, by affidavit, Patrolman Kelly alleged obtaining information of the offering for, or sale of, obscene material at a different location. On April 25, 1963, at 2:45 p.m., he was in the subject bookstore premises and saw on the cash register counter “ a box containing a large number of photographs in glassine envelopes,” one set of which (12 photographs) he purchased. On each one there was a female depicted, ‘ ‘ posed in lewd and indecent poses and in various stages of undress.” To his *611 knowledge, arrests had previously been made in that location; and he believed that his purchased pictures and others which he saw displayed were obscene.
Before issuing the warrant the court examined the pictures purchased. It stated that the aforesaid affidavit indicated probable cause for believing that the “ certain property consisting of obscene, lewd and indecent material ’ ’ was then being sold, or offered for sale in violation of section 1141 of the Penal Law and commanded an immediate search of the ‘ ‘ ground floor level store ” at the subject location and seizure of the property 11 consisting of obscene, lewd and indecent photographs.” On April 29, 1963 this was done by Officer Kelly, after seeing other similar displays and having purchased a set for $1. He arrested the defendant, Zueker, and another, and seized 750 glassine envelopes from the cash register counter.
CASE No. 3: abraham bernstein. Patrolman Viola was again the applicant for a search warrant here. Like the others, he had information concerning “ obscene material” at still a third location: books entitled “ Bondage Seduction” and “ Bondage Fight ” and “ sets of photographs depicting females in various stages of undress, posed in suggestive manner, some with buttocks and breasts naked and accentuated and with items of clothing such as garter belts and panties used as props, samples of which have been exhibited to this Court.” He bought “ one strip ” of photographs thus described for $1 (attached to his affidavit) and one volume of the book “ Bondage Seduction ” for $4 (also attached) on June 12, 1963, and two days later bought another strip of such pictures for $1 and a copy of “ Bondage Fight ” for $3, both of which articles were attached to his affidavit. The affiant read both books, and “ after examining the photos and reading the boohs recited, the Court issued a warrant,” stating that there was probable cause to believe that the above was in violation of the statute and commanded a search 1 ‘ for obscene or indecent material ’ ’ being sold in the premises mentioned. On June 18, 1963, Officer Viola bought another copy of “ Bondage Fight” for $3, then arrested the defendant, seized three copies of “Bondage Seduction” and 239 sets of photographs of females in various stages of undress.
CASE No. 4: charles green. Patrolman Greifenstein, having had information that certain Ember books “ may be pornographic ”, he and his partner browsed in a store where he saw these Ember books displayed on July 20, 1963, asked a clerk about them, was told there was much fornication, etc., in them, bought three of them: “ Sin Merchant ”, “Strumpet ” *612 and “ Call Boy,” read them and concluded that “ said books are of a pornographic nature.” In his affidavit in support of a search warrant, the above was set out, and the books were submitted to the court. While the agreed statement of facts does not reveal that the court read the books, the search warrant was issued reciting that there was ‘ ‘ probable cause for believing ” that such property was being sold in violation of the statute and ordered a seizure of “ obscene, lewd and indecent books ” thereat. The patrolman did so two days later, taking 14 books of the above titles plus “4 books titled Sin Census, 4 books titled Sin’s Cell, 4 books titled Joy Job, and 4 books titled Passion Pot ” — a total of 30 books, the defendant having first been arrested.
CASE No. 5: charles green and john lbavy. Patrolman Adelson this time made an affidavit in support of an application for a search warrant. He had information concerning ‘ ‘ obscene material ” being sold at 598 Seventh Avenue: “ a book entitled ‘ Sin Merchant ’ * * * and ‘ Call Boy ’ * * * samples of which have been exhibited to this Court.” He, on two succeeding days (July 17, 18, 1963) bought a copy of said books at $1 each (copies of which were attached to his affidavit). Officer Adelson read the books and “ believed that they were being offered for sale in violation of Section 1141 ” of the Penal Law. The request for a search warrant was granted on the basis of such ‘ ‘ proof by affidavit * * * that there is probable cause for believing that ” the certain property, namely, the two afore-mentioned books, “ samples of which have been offered to the Court as exhibits ’ ’ were so violative. It further directed the search and seizure thereof as “indecent books.”
On August 1,1963, Officer Adelson entered the store, searched it, and in a safe saw four copies of “ Sin Merchant ”, four copies of “Call Boy” and one copy of “Tropic of Cancer.” The arrest was made for the sales by Green, on July 17 and 18, 1963, and for Leavy’s assertion of his being in charge of the premises. Those are all the facts.
The general claim is made by defense counsel that, except for Case No. 5, there was nothing in the warrants limiting the material that could be seized. In other words, he asserts only a loose command to have been ordered to seize “ obscene and indecent material ” without particularizing what specific material was intended. Thus he bottoms his argument on the method employed to search and seize, rather than on the court’s order so to do in a proper case; for admittedly “ obscenity is not *613 within the area of constitutionally protected speech or press ” (Roth v. United States, 354 U. S. 476, 485).
But at what point does the First Amendment come into play when a search is made of questionable material by a challenged method? For we are to comply fully with the “ preferred place given in our scheme to the great, the indispensable democratic freedoms secured ” thereby (Thomas v. Collins, 323 U. S. 516, 529-530) lest “We risk erosion of First Amendment liberties * * * [We must] train our vigilance upon the methods whereby obscenity is condemned no less than upon the standards whereby it is judged. * * * It surpasses in general significance even the important issue of the standards for judging this material” (Mutual Enterprises v. Day, 370 U. S. 478, 497-498).
If, indeed, the methods of condemnation are of even greater consequence than the standards of judgment, let us first assess the standards of judgment and see if any satisfactory measuring rod can be found to equate the decision of one Judge with another whose background or life experience is different, and who views the same facts from a different life dictionary containing definitions not quite akin. There are case-made guidelines, of course. But as was said in People v. Fritch (13 N Y 2d 119, 123): “The term ‘ obscenity ’, however, is not susceptible of precise definition. It must be viewed in juxtaposition to time, place and circumstance, so that whether a particular work falls within the ambit of constitutional protection or is subject to regulation by the State must be determined by a case by case process of inclusion and exclusion. ” Now, how can any generalization be arrived at when so ephemeral a situation is presented to courts of differing points of view? There is great latitude between the external borders laid down by such cases as Roth v. United States (354 U. S. 476, 489, supra)[6]; Manual Enterprises v. Day (370 U. S. 478, 482, supra)[7] and People v. Richmond County News (9 N Y 2d 578, 589).[8] This causes the conflict of opinion; nor do I believe any unanimity is ever possible within the framework *614 of those outer limits. Thus I can dispute entirely the results obtained in the case before one court (see footnote 4) or I can disagree in part only with another. For instance, I quite agree with Judge G-assmast’s conclusion in People v. Bookcase, Inc. (40 Misc 2d 796, 801, supra, footnote 2). But he asks: “ Should it be said that a law which protects a minor’s body is constitutional, but that a law which seeks to protect his mind is not? ” and expects everyone to answer in the negative. With that I must disagree. Man’s body is shackled by its own physical limitation. With the aid of an artifice (a flexible fibre glass pole) he can now propel himself about 17 feet above the earth; without it, he can high-jump only about 7 and a-half feet. Not so his mind. There are no limitations to his mental projections, from the center of our earth planet to the outer regions of our ever-expanding space universe. There is no strenuous objection to limiting effects upon the body by law for protective physical benefit. However, mankind can only be progressively benefited by the boundless ideas emanating from that grey matter contained in the relatively small cubicle of the cranium. The real question is whether the results of all the imaginative processes of the brain may be foisted upon less fertile minds for selfish mundane profit on the sole basis of the censorship taboo, although some of those mental emanations, in the opinion of the people as a whole, are more hurtful than helpful.
A pragmatic approach here is necessary. If the proscription of the use of censorship against writings is an end in itself, then the results — deleterious or therapeutic — are unimportant and it should be taken from the judicial sphere of competence; but if the worship of this god “ no censorship” is less compelling than publishers have proclaimed it, then the use of censorship must be made entirely judicial, circumscribed by the wants and needs of the people, not by the singleness of a court’s mind. The Judge must project himself into the collective thinking of the community, and, without in any way fettering the mental wanderings of the artist, the writer, the scientist, must decide not what he thinks is good for the community, but what he believes the community wants for its own consumption, leaving the creativity of the mind to continue without all of its goals to be available generally to the public.[9]
*615 I can again disagree wholly with another court for other reasons: A court, it seems to me, should not abandon its right to decide the question of pornography to so-called “ experts ” in the literary field (some of whom are either publishers themselves, or so allied with, or dependent upon them that to give an impartial appraisal is indeed difficult). That is why I prefer to accept the results of Larkin v. Putnam’s Sons (40 Misc 2d 25) in its initial stage of the temporary injunction (Masks, J.) to that in its final stage, before appeal (Klein, J., 40 Misc 2d 28). The latter court, applying, ostensibly, the three tests: prurient interest, patent offensiveness and hardcore pornography, decided that “ the high literary quality of the book ” (p. 31) based on the testimony of “witnesses, all highly qualified and eminent in their field, ’ ’ who ‘1 characterized the book as an historical novel (to a limited extent), * * * and their praises ranged from ‘ extremely interesting ’ to ‘ skillful ’ ” (p. 32), found “ that the book herein sought to be suppressed is an historical novel of literary value ”!
It is at least debatable whether this was not stultification and whether these experts did not give their testimony with tongue-in-cheek and with crossed fingers. What valid history is revealed by “ Fannie Hill ” is beyond me. At least “ Forever Amber ’ ’ by Kathleen Winsor did, in fact, portray true history, according to historians, who had no subjective interest in the novel as a literary work. To balance the book, ‘ ‘ Fannie Hill” against the recent Profumo case, as did that court, is taking an invalid position, I believe. The latter was a current report of news, albeit sensational news. The book is just a succession of sex acts and whether they be considered normal or not is immaterial. They contain only clinical descriptions, thumbing noses at accepted communal normality — yes, even by today’s loosened standards. As Chief Judge Desmond said in concurring: ‘ ‘ Local communities and their governance are not helped by a literal, doctrinaire reading of ‘ Freedom of the press (People v. Fritch, 13 N Y 2d 119, 128, supra.) I agree fully, for another instance, with the conclusion of the majority of this court.
So Judge Klein and I are at opposite sides of the “ standards ” framework, since he decided the book to be inoffensive ‘‘ when examined in the light of current community standards ’ ’ (40 Misc 2d 28, 33, supra). It reminds one of that apocryphal story about the Court of Appeals’ opinion which began with the words, “ This is a case in which no two reasonable men can differ ”, the case then being decided by a 4 to 3 vote of that court.
*616 With this inconclusiveness of application of the standards of judgment, let us proceed to the question of methodology, generally, and that involved in this case particularly.
Justice Sobel in his recent series of articles entitled “ Current Problems of the Law of Search and Seizure ” (N. Y. L. J., Oct. 28 to Nov. 4,1963) stated that despite the generally agreed-upon principles laid down by the cases, “ judges can, and often do, disagree upon identical facts situations.” But “it is the responsibility of the ‘ Magistrate ’ to issue only the warrant authorized by the information in the possession of the police ” * * * “ The Fourth Amendment is intended to deter unlawful conduct by the police (McDonald v. U. S. 335 U. S. 451, 455) ”. Defendants’ counsel no doubt would agree with this, as do I. We can also agree, with respect to the Fourth Amendment requirements, that only those warrants may lawfully issue, once probable cause is present, which particularly describe the place to be searched, and the things to be seized.
The basic constitutional caveat is that no unreasonable, not reasonable, searches shall be allowed, assuming the other legal essentials. (People v. Marshall, 13 N Y 2d 28, 34.) And although the lack of probable cause has been eliminated as a disputed fact from this case, the result does, indeed, impinge in some degree on the extent that the probable cause here extant transcends the narrow agreement that there was such probable cause. In other words, does the probable cause in this instance pervade the warrant to the point of validly making particular reference to things to be seized although not particularized per sel Or, further, despite the clarity with which the officers spelled out the alleged obscenity to be for sale, and actually sold, all of which was substantiated in the issuing court’s mind after perusal, can the ensuing seizure under the warrant be held to be legal only if the warrant spells out each name of every book of like import in hcec verba and every alleged obscene picture be described with such particularity as to obviate the calling of the warrant a general one 1 That would mean, in Case No. 1, the naming of at least 114 books although admittedly they all were “ of a similar nature which were on display ”; in Case No. 2, the describing of 750 sets of 12 pictures each; in Case No. 3, 239 sets of such photographs, although they were generally described as being similar to those purchased, undoubtedly some of them being exact duplicates, etc.
If this is to be the case every time, I would guess that the police would have to give up their law-enforcement activities and become inventory takers; and by the time they finished the *617 listing, none of the articles would then be where the police saw them.
There is, of course, no cavil with the defense argument that a weakness of a search warrant under the Fourth Amendment is “the lack of specific limitation (i.e., place of search and identity of persons and things to be seized) in their execution.” But does specificity have to go beyond ordinary intelligible classifications of specific items? It seems to me that if there is logical inclusion of the ensuing search within the things enumerated, the lack of itemization will not destroy the effectiveness of the warrant when executed. Judge Sobel states as to area: “A search warrant must specifically describe the premises to be searched. In such a case ‘ area ’ is pre-determined by the Magistrate. (People v. Marshall, 13 N Y 2d 28.) ” He continues: ‘ ‘ Bach case turns on the nature of the crime; the crime in turn determines the product sought; the product sought will determine the area of search. Thus a search for stolen typewriters will not justify rummaging through desks and drawers, but a search for narcotics may” (N. Y. L. J., Oct. 30,1963, p. 4, col. 5).
Thus, the seizure of the books and pictures specifically mentioned in the affidavits and referred to in the warrants will justify the further search and seizure of similar articles — indeed, even if it were a search as an extension of a valid arrest without a search warrant. Should, then, the obtaining of a search warrant beforehand make the seizure more vulnerable to an attack such as here made? If so, I doubt if there would be anything but the flouting of section 1141 of the Penal Law.
I also question whether the case of Marcus v. Search Warrant (367 U. S. 717) on which defendants rely so heavily, can change the situation here. In that case, a general (so held) search warrant was issued (in advance of the court’s inquiry and without its perusal of any alleged pornographic product) and the police seized whatever they thought to be obscene. Because of the lack of proper due process safeguards to assure the exemption of nonobscene material from seizure, the court stated that the execution was “ obviously deficient in techniques * * # to prevent erosion of the constitutional guarantees ” (p. 733). Not so here. The officers were not the sole judges of the material bought. To paraphrase the court in Stengel v. Smith (18 A D 2d 458, 460) there was here “judicial scrutiny of the publications prior to the seizure.” And for the reasons stated above, not every volume had to be read, nor every picture *618 seen and described particularly by the court to bring validity to the warrant. The balance of the material seized falls well within the ambit of the particularized seized material when the affidavit and warrant are utilized as a unit for authority. I do not believe one can argue backwards, to say that because the unnamed, or undescribed additional material should not have been taken, the named material in the affidavit on which the warrant was granted is of no consequence, because it is now a general warrant; nor do I believe (as argued by defendants by juxtaposing portions of the opinion) “ that a State’s power to suppress obscenity is limited by the constitutional protection for free expression ” (Marcus, p. 730) under all circumstances. (Cf. Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495, 502.)
If it were otherwise, the collective individual rights making up the whole of a community would be in every instance disregarded in favor of each isolated case to the detriment of the many. The Supreme Court could hardly have meant the latter; and indeed it did not. It recognized, in Smith v. California (361 U. S. 147, 155) that there was “ The existence of the State’s power to prevent the distribution of obscene matter” but only that it “does not mean that there can be no constitutional barrier to any form of practical exercise of that power ” because in Roth v. United States (354 U. S. 476) the court did not “ recognize any state power to restrict the dissemination of books which are not obscene ” (id., p. 152).
The court in Marcus struck down the offending procedures because of the absence of a fundamental “ insistence ” by the court 1 ‘ that regulations of obscenity scrupulously embody the most rigorous procedural safeguards ”. (Bantam Books v. Sullivan, 372 U. S. 58, 66.) The seizure was based upon “ the conclusory assertions of a single police officer, without any scrutiny by the judge of any materials considered by the complainant to be obscene ” (Marcus, p. 732). It never reached the point of deciding whether the Missouri statutory scheme was good or bad (p. 738). In the instant matter the safeguards were scrupulously adhered to by the law-enforcement agencies and the court, in order to avoid just such an attack (which came anyway).
And while a trial is no all-encompassing substitute for a motion to suppress, the denial of this combined motion, as I am here deciding, is not the end for the defendants; for the People must still prove beyond a reasonable doubt upon a trial, that the materials taken by the police under the search warrants are obscene, which is much more exacting than the mere raising *619 of a reasonable ground to believe that they are obscene — the limit of the court’s requirement before issuing the warrant.
For all of the above reasons, the motion to suppress in each instance is denied. The District Attorney and defense counsel, in consultation, shall decide upon a convenient date for trial which I shall indorse upon the papers when I am so advised.

. See the Medical Academy’s report quoted in People v. Fritch (13 N Y 2d 119, 121): “ Such reading encourages a morbid preoccupation with sex and interferes with the development of a healthy attitude and respect for the opposite sex. It is said to contribute to perversion. In the opinion of some psychiatrists, it may have an especially detrimental effect on disturbed adolescents.” It is not my purpose to confine these remarks to the effect of pornography on children. I am acquainted with Butler v. Michigan (352 U. S. 380). I have no intention “to reduce the adult population of [New York]; to reading only what is fit for children” (p. 383). “It is only with the normal person that the law is concerned ” (United States v. One Book called “Ulysses”, 5 F. Supp. 182, 185 [Woolsey, J.], affd. 72 F. 2d 705).

. “ The guarantees of freedom of expression give no absolute protection for every utterance. All ideas, even unorthodox ideas or ideas hateful to the prevailing climate of opinion, have the full protection of the guarantees, unless excludable because they encroach upon the limited area of more important interests. (See Roth v. United States, 354 U. S. 476; Beauharnais v. Illinois, 343 U. S. 250.) ” (Concurring opinion of Silver, P. J., in People v. Bookcase, Inc., 40 Misc 2d 796, 802.)

. Viz.: The Mayor’s Committee chaired by Deputy Mayor Edward Cavanagh; the Fast of Father Hill; the other action taken by school principals. (Cf. People v. Fritch, 13 N Y 2d 119; Roth v. United States, 354 U. S. 476, 484-485.)

. “ [T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn e e 6 [t]he separation of legitimate from illegitimate speech calls for * * * sensitive tools ” (Speiser v. Randall, 357 U. S. 513, 525).

. Its additional purpose is to dissuade those who attribute decisions to “personal predilections or whims,” because they are contrary to their own conclusions (Shapiro, J., in People v. Druss, N. Y. L. J., Sept. 10, 1963, p. 16, col. 4; People v. Birch, 40 Misc 2d 626, 630-631). A Judge is of little worth if he cannot be objective enough to decide impartially. But in doing so, his life experience cannot be shunted aside, nor can reality derived from that life experience. It is only the theoretical mind that remains unreal in decision which does not encompass such experience. And the Constitution is no bar to results obtained in the light of experience. Even Judge Shapiro, in those cases, ignored his own “predilections” — really, his life experience — by stating that the writings there involved were “poor * * * bad in taste, profane, offensive and disgusting,” and then quite inconsistently holding them to be “ not obscene within the meaning of section 1141 of the Penal Law ” (p. 634), apparently because no dirty, four-letter words were used to portray the “lurid descriptions of sexual activities, both hetero and homosexual, in sufficient detail to act as an erotic stimulus to those so inclined.” One wonders why. I do not consider fostering “ the mores of these days ” (hardly clean according to Judge Shapiro) a judicial function any more than is censoring the constitutionally uncensorable. Or is one to judge the predilections of the decider to be on the side of more pornographic intake by the public ? It may be quite easy to admonish that the “ censorship in the home” should be a substitute for “judicial flat;” but will that remove the “plain unvarnished trash” (as these books were described by Judge Shapiro) from the bookshelves by the self-discipline of the publishers, so as to take the temptation away from the formative minds, even with ideal “censorship in the home?” I doubt it. That is what makes it so impractical to theorize with such a vital subject.

. The pertinent parts of these Amendments are:
First: “Congress shall make no law * * * abridging the freedom of speech, or of the press”.
Fourth: “ The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons to be seized.”
Fourteenth: “No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, dr property, without due process of law”.

. “ Whether to the average person, applying eontemparary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.”

. “These magazines cannot be deemed so offensive on their face as to affront current community standards of decency — a quality that we shall hereafter refer to as ‘ patent offensiveness ’ or ‘ indecency.' ”

. “The inquiry for the court, therefore, is whether the publication is so entirely obscene as to amount to ‘hard-core pornography’”.

. “Fanny Hill” survived for over 200 years (if it be considered art) without its general public acceptance. I doubt if eventually it will not be relegated to its former uncirculated state.