Joel J. Tyler, J.
This case involves an obscenity prosecution, in that, each of the defendants[1] is charged with promotion, or possessing with intent to promote, obscene material, knowing the contents and character thereof, all in violation of subdivision 1 of section 235.05 of the Penal Law, a class A misdemeanor. It was tried before the court without a jury.
THE TESTIMONY
For the People, Patrolman Megna stated that on the afternoon of August 25, 1969, he entered the East Side Bookstore and there saw defendant, Terrence McCoy, behind the counter. There was a showcase in front of the sales counter with copies of the magazine, entitled, “ Zap Comix No. 4 ” (herein referred to as, “ Zap No. 4 ”) therein contained. He asked McCoy for one; it was delivered and McCoy was paid 50 cents.
On August 25, and again on September 17, 1969, Officer Megna made a similar purchase from defendant, Kirkpatrick, who was behind the counter at the New Yorker Bookstore.
Officer Bourdon then testified that on September 17, 1969, he arrested defendant McCoy under a warrant secured by Officer Megna and that on that day he also purchased a copy of the said magazine from defendant Dargis at the East Side Bookstore and ‘ ‘ observed numerous copies ’ ’ of that magazine in a glass case. The People introduced no evidence, whatsoever, as to the character or contents of Zap No. 4, but merely urged the court that its examination would reveal that the material contained therein is obscene “as a matter of law.”
Of course, the defense was understandably protracted; its requirements were far more complicated than that of the prosecution, since it had to establish positions and follow criteria made necessary by a host of United States Supreme Court cases starting in 1957.
Defendant Dargis testified he was, and had been, for one and one-half years, the manager of the East Side Bookstore; that he was the only employee authorized to make purchases of merchandise; that he purchased Zap No. 4 for the store and with another employee unpacked them and placed them on the shelf for sale; that he had purchased for sale four prior issues of that same magazine; that he had almost all the ordered 200 copies *1057 of Zap No. 4 on the shelf when arrested; that he had personally sold 20 to 25 copies thereof; that he had sold 50 to 60 copies of prior issues of Zap, after having similarly unpacked them and placed them on the shelf for sale; he admitted looking or “ glancing ” at the “ ending pages ” of Zap No. 4 “ one time or so ”, but insisted that he did not look at the contents carefully; that he never discussed the character or contents of Zap with anyone; that the bookstore carries some 50,000 to 60,000 volumes in 16,000 titles; that its gross yearly sales are about $100,000, with magazines such as Zap No. 4 representing less than 1% of the gross; that the store receives about 100 titles each week and that he does not have the time or inclination to examine all of them; that he never saw a copy of Zap No. 4 prior to the store’s purchase thereof, which was made from a publisher’s circular, containing no particulars of its contents; that when he received Zap No. 4, he did look at its cover, which had printed thereon “ Adults Only ”; that defendant, McCoy did not work on August 25, 1969. A “ day sheet”, indicating those employees working each day was introduced which showed McCoy did not work that day.
Defendant McCoy denied that he was in the bookstore on August 25, 1969, or sold the copy to Officer Megna; that he has long straight hair and is 5 feet 8% inches tall, in contradiction to the arrest warrant which describes the person who sold Zap No. 4 to Officer Megna as having curly hair and being 6 feet 1 inch tall, which McCoy states describes Bob Gillespie, another employee.
Defendant Kirkpatrick testified he was co-manager of the New Yorker Book Shop; that he performs the office work, billing invoices, accounting, makes reorders and sells in the store; that he had personally sold 25 to 30 copies of Zap No. 4, and assumed that that issue was similar in content to Zaps No. 0 and 1, which he had looked through; that the store carried no “ girlie ” magazine other than Playboy and Cavalier; that the store carries 10,000 to 12,000 titles; yearly gross sales were about $130,000 and sales from Zap No. 4 represents less than a fraction of 1% of total sales; that he had never read Zap No. 4 prior to his arrest; that the store had sold all four prior issues of Zap, each store purchase being 150 copies.
The other four witnesses, on behalf of the defense, were ‘ ‘ experts. ’ ’ They testified substantially as follows: That Zap No. 4 was a comic or cartoon magazine; that all the cartoonists were ‘ ‘ original ’ ’ and particularly gifted, and that they were “ influencing a new generation of cartoonists” and some had “ enormous vitality ”, that the material (cartoons) was directed *1058 at a “ very intelligent perceptive group ” or those with “ unusual sophistication.” One witness claimed that the material was directed to the “ general public ”, but only the “ intellectually elite ” could properly respond to its meaning; that the common theme of the cartoons is sex or sex in satire. Another witness characterized the theme throughout as a commentary on sexual mores — satirizing conventional relationships and attitudes of middle-class society. One witness, the curator of a well-known New York City art museum, stated that he thought so highly of some of these cartoonists as artists that he had used some of their prior work in a public exhibit, but admitted he would not have exhibited any of the material in Zap No. 4 by the same cartoonists since his exhibit dealt with only real-life situations and the material in Zap No. 4 was pure fantasy. One witness, an experienced cartoonist, characterized the cartoons as ‘1 underground material ”, without defining it. I find that all of these witnesses failed to particularize in understandable lay terms their generalizations that the cartoonists were ‘1 original ’ ’, or how they were “ influencing a new generation of cartoonists ” or how they showed “ enormous vitality ” or where was the satire or parody of the sexual experiences depicted; or why was the explicit sexuality, as demonstrated, necessary to the theme (i.e., a commentary on conventional relationships in middle-class society): or how do these cartoons, dealing as they do in the main with perverted sexual experiences, attempt to 1 * humorously outrage ’ ’ the reader and place in perspective human values.
THE ISSUES
The defense has raised several intriguing and difficult issues, as follows :
1. (a) Proof of scienter or knowledge by defendants of the content and character of the material is vital to establishing a prima facie case. To fulfill such requirement, the prosecution relies upon the presumption of subdivision 1 of section 235.10 of the Penal Law. Is that presumption unconstitutional, as defendants claim? It appears that this question has not yet been determined by any appellate court of this State.
(b) Assuming its constitutionality, have the defendants satisfactorily rebutted the presumption?
2. May the prosecution validly maintain that the material is obscene as a matter of law, and can be so observed without the necessity of supporting expert testimony, and this in view of the testimony of defendants5 four ‘ ‘ experts ’ who attempted to demonstrate the magazine’s social redeeming nature?
*1059 3. Is the material legally obscene ? In this connection are these subsidiary considerations:
(a) The cases hold, say the defendants, that if the material is intended for a particular recipient group, it is not obscene if it fails to appeal to the prurient interest in sex of that group, notwithstanding its admitted obscenity for the general public. Are the “ sophisticated ” or “ intellectually elite ” such a group, as defendants maintain.
(b) Does the artistry of the cartoonists or the alleged ideas conveyed save the material from legal condemnation?
THE BACKGROUND
There is perhaps no area of criminal law in such utter state of confusion and frustration as that visited upon the publication and dissemination of obscene material. “ Confusion now hath made its masterpiece ” (Macbeth, Act II).
The confusion, in great measure, must be attributable to the incredible divergence of views of the men on the United States Supreme Court, to whom all look for guidance.
For example, in March, 1966, the court ruled in Ginzburg v. United States (383 U. S. 463); Mishkin, v. New York (383 U. S. 502); and A Book Named ‘ ‘ John Cleland’s Memoirs of a Woman of Pleasure ” v. Attorney General of Massachusetts (383 U. S. 413 [i.e., the famous Fanny Hill book, hereinafter referred to as Memoirs v. Massachusetts]). The disagreements of the Justices were so grave that 14 different opinions were written in these three landmark cases. In Ginzburg the vote was 5-to-4 to affirm, in Mishkin 6-to-3 to affirm, and in Fanny Hill, 6-to-3 to reverse.
The extent of this and earlier divergence is indicated in Redrup v. New York (386 U. S. 767, 770-771 [1967]): “ Two members of the Court have consistently adhered to the view that a State is utterly without power to suppress, control, or punish the distribution of any writings or pictures upon the ground of the ‘ obscenity ’. A third has held to the opinion that a State’s power in this area is narrowly limited to a distinct and clearly identifiable class of material. Others have subscribed to a not dissimilar standard, holding that a State may not constitutionally inhibit the distribution of literary material as obscene unless ‘ (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value,’ emphasizing that the ‘ three elements must coalesce,’ and that *1060 no such material can ‘ be proscribed unless it is found, to be utterly without redeeming social value. ’ * * * Another Justice has not viewed the 1 social value ’ element as an independent factor in the judgment of obscenity.”
As late as 1968, Justice Harlan bemoaned the fact that in the 13 obscenity cases heard by his ultimate tribunal since Both v. United States (354 U. S. 476 [1957]), and in which signed opinions were written for a decision or judgment, there had been a total of 55 separate opinions among the Justices. He further indicated that this variety of views is “unmatched in any other course of constitutional adjudication ’ ’, and examination of obscenity decisions of the court to determine what material is deemed obscene, would cause 1 ‘ utter bewilderment. ’ ’ Such Supreme Court decisions, Justice Harlan laments, result “to no better end than second-guessing state judges.” (Interstate Circuit v. Dallas, 390 U. S. 676, 704-705, 707 [1968].)
Confusion of such magnitude in our highest court must and does lead to judicial frustration. But perhaps no Judge has been more frustrated by our greatest court than Pennsylvania’s Supreme Court Justice Musmanno, when he caustically commented in Commonwealth v. Dell Pub. (427 Pa. 189, 231 [1967], cert. den. 390 U. S. 948 [1968]) that the Supreme Court in areas of obscenity, “ has failed to live up to its solemn responsibility of protecting, through a serious interpretation and firm enforcement, of the laws of the land, the ramparts of moral standards ’ ’.
Nor have our State tribunals found any greater solace in this area. They have been consistent only in their disagreement and are similarly plagued by divergence within their highest State courts as they are from State to State. Two examples will suffice, but there are many others:
Henry Miller’s Tropic of Cancer, when introduced by Grove Press into this country in 1961, gave birth to a large litter of prosecutions. It was found obscene in one Federal Circuit Court (unanimous decision) and in New York (4-to-3 decision), Connecticut, Florida, Illinois, and Pennsylvania.[2] It was found not obscene in at least three States, California, Massachusetts and Wisconsin.[3] Then the United States Supreme Court in *1061 June, 1964 reversed the Florida holding of obscenity in a typically diverse 5-to-4 decision (Grove Press v. Gerstein, 378 U. S. 577 [1964]).
John Cleland’s Memoirs of a Woman of Pleasure, commonly known, simply, as Fanny Hill, was written in England in the mid-eighteenth century and was subject to prosecution almost from the day of its initial publication. It was held to be obscene in this country as early as 1821 in Massachusetts,[4] only six years after the first decision sustaining an obscenity conviction was reported in our land.[5] In 1963, the prestigious publishing house of G-. P. Putnam’s Sons, published and distributed the book. New York promptly took up the cudgel, and Mr. Justice Klein of our Supreme Court, found it not obscene (Larkin v. Putnam’s Sons, 40 Misc 2d 28 [N. Y. County, 1963]). On appeal, our Appellate Division reversed in a split 3-to-2 decision (Larkin v. Putnam’s Sons, 20 A D 2d 702 [1st Dept., 1964]). Again, on appeal to our highest State court, it reversed the Appellate Division in a 4-to-3 decision and gave the book, which even the majority characterized as “erotic”, legal sanction (Larkin v. Putnam’s Sons, 14 N Y 2d 399 [1964]).
In Massachusetts, its highest court, the same court interestingly enough which found Tropic of Cancer not obscene, now found Fanny Hill obscene and, like New York, but in the opposite direction split 4-to-3. (Attorney General v. A Book Named “John Cleland’s Memoirs of a Woman of Pleasure”, 349 Mass. 69 [1965].) New Jersey also initially found it obscene (Putnam’s Sons v. Calissi, 86 N. J. Super. 82) but on appeal changed its mind by reversing its lower court (50 N. J. 397 [1967]). The Massachusetts case was appealed to the United States Suprbme Court (Memoirs v. Massachusetts, 383 U. S. 413, supra) and, of course, reversed in a 6-to-3 decision, adding another bead to) the string of confusions.
In the light of such cacophony of indecision and disorder, we can readily agree with Judge Moore that “ a comparison of judicial reactions to recent causes celebres suggests that! the judiciary in our tormented modern civilization are also lost in the wilderness.” (United States v. Klaw, 350 F. 2d 155, 168 [C. C. A. 2d, 1965].)
How delightfully simple it was for our judiciary in the old days, prior to 1957, when they merely had to apply a Concise and easy rule (wrong as it was) to determine obscenity — sa rule *1062 which merely applied the effect of any isolated passages of a writing upon any particularly susceptible persons. Lord Chief Justice Alexander Cockburn first described that memorable test back in 1868 in Regina v. Hicklin (3 Q. B. 360, 371): “ I think the test of obscenity is this, whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall”
But alas, like so many uncomplicated principles, the credibility of this Hichlin test, as it became to be known, was placed in serious doubt as early as 1913 by the illustrious Judge Learned Hand, who refused to permit society 1 ‘ to reduce our treatment of sex to the standard of a child’s library in the supposed interest of a salacious few, or * * * to accept for its own limitations those which may perhaps be necessary to the weakest of its members.” (United States v. Kennerley, 209 F. 119, 120-121 [S. D. N. Y., 1913]); but he nevertheless, held the old test binding as existing law. It was not until 1933, that the first effective onslaught was made upon the Hichlin test when Judge John M. Woolsey rejected it in United States v. One Book Called “Ulysses” (5 F. Supp. 182, 184 [S. D. N. Y., 1933], affd. 72 F. 2d 705 [C. C. A. 2d, 1934]) and applied a new test — obscenity was to be measured by the effect the material had on “ a person with average sex instincts, ’ ’ — the well-known ‘ ‘ reasonable man.” But the Hichlin test was dealt a knockout blow in 1957, in Butler v. Michigan (352 U. S. 380) when Mr. Justice Frankfurter, writing for a unanimous court (a rarity in obscenity cases), rejected any obscenity law which would quarantine the general public against books not too rugged for grown men and women in order to shield juvenile innocence. The burial of Hichlin came finally and unequivocally several months later in 1957, when the Supreme Court established its new and revolutionary test of obscenity in Roth v. United States (354 U. S. 476, supra) marking the beginning of the obscenity debate which remains undiminished in its vigor to this day. And so we pass from the simple clarity of heaven back to the delusion and confusion of purgatory.
Now, I, a Judge of this nisi prius Criminal Court, must for the first time tread upon such fields, lying in confusion ánd disorder by history. I have no trepidation, for, in such an arena of disorder, I shall be as right as the multitude of the judiciary who have gone before me, sometimes, subject to “ second-guessing ” by appellate brethren.
*1063 THE CONSTITUTIONALITY OF THE PRESUMPTION IN SECTION 235.10 (SUED. 1) OF THE PENAL LAW
Subdivision 1 of section 235.10 of the Penal Law declares, wherein here relevant, as follows: “ A person who promotes * * * obscene material, or possesses the same with intent to promote * * * it, in the course of his business is presumed to do so with knowledge of its content and character.” £i Pro mote ’ ’ means “ to * * * sell * * • * deliver, transfer * * * distribute ® * * exhibit * * * or to offer or agree to do the same.” (Penal Law, § 235.00.)
The defendants have attacked the constitutionality of subdivision 1 of section 235.10. It would appear that its constitutional validity has not been tested by the courts of this State. The prosecution, of course, relies on it to prove its prima facie case. The defendants argue that said subdivision 1 of section 235.10 denies them due process, in that: although the Legislature may provide that proof of one fact may constitute prima facie evidence of another; however, there is here ‘£ no rational connection between the fact proved [i.e. selling, or possessing obscene material with intent to sell] and the ultimate fact presumed [i.e., knowledge of the material’s contents and character] ’ ’, citing Tot v. United States (319 U. S. 463, 467-468 [1943]).
“It is not reasonable and logical to presume,” say the defendants in their trial memorandum II, £ £ that a bookseller in a general bookstore who has more than 25,000 volumes upon his premises has knowledge of the contents and character of his books.[6] * * * It would be physically impossible for the bookseller to acquaint himself with daily and weekly shipments.” The defendants direct us to Smith v. California (361 U. S. 147 [1959]) and urge that our subdivision 1 of section 235.10' does not meet the requirements of scienter there mandated.
In Defiance Milk Prods. Co. v. Du Mond (309 N. Y. 307, 540-541 [1956]) we are advised that a basic restraint is placed upon the courts when considering the constitutionality of a statute, in that — “Every legislative enactment carries a strong presumption of constitutionality including a rebuttable presumption of the existence of necessary factual support for its provision (Borden’s Co. v. Baldwin, 293 U. S. 194, 209, 210). If any state of facts, known or to be assumed, justify the law, the court’s power of inquiry ends (United States v. Carolene Products Co., 304 U. S. 144, 154). Questions as to wisdom, need or appro *1064 priateness are for the Legislature (Olsen v. Nebraska, 313 U. S. 236, 246).”
Further, ‘ ‘ courts are reluctant, and it is only as a last resort, that they will strike down a solemn legislative enactment on the ground that it is unconstitutional.” (Matter of Ahern v. South Buffalo Ry. Co., 303 N. Y. 545, 555 [1952], affd. 344 U. S. 367; see, also, United States v. Delaware & Hudson Co., 213 U. S. 366, 407-408 [1909]; People v. Pagnotta, 25 N Y 2d 333, 337 [1969]) ; and it will not do so unless such solemn legislative enactment is demonstrated to be unconstitutional beyond a reasonable doubt. (Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 79 [1911] ; Matter of Fay, 291 N. Y. 198, 206-207 [1943]; Matter of Van Berkel v. Power, 16 N Y 2d 37, 40 [1965]. Also Paterson v. University of State of New York, 14 N Y 2d 432, 438 [1964] ; Gregory v. Ball, 25 Misc 2d 861, 864 [1960].) “No statute should be declared unconstitutional if by any reasonable construction it can be given a meaning in harmony with the fundamental law [cases cited] ’ \ (People v. Finkelstein, 9 N Y 2d 342, 345 [1961].)
So cautioned by our high courts, we proceed with consideration of the constitutionality of said subdivision 1 of section 235.10.
Presumptions are an old, necessary and common vehicle in our laws. Tot v. United States (319 U. S. 463, supra) established the test for determining a presumption’s constitutionality, but, in doing so, I believe it fails to give the defendants the support they desire. That ease involved a discussion of a presumption in the Federal' Firearms Act, wherein it prohibited the receipt of a firearm or ammunition, shipped in interstate commerce, by anyone who had been convicted of a crime of violence or was a fugitive from justice, and raised the presumption that mere possession of such firearm or ammunition by such person was “presumptive evidence” that the same was shipped in interstate commerce. The court, in declaring that presumption a violation of the due process clauses in the Fifth and Fourteenth Amendments, said (supra, pp. 467-468), in part: ‘ ‘ Under pur decisions, a statutory presumption cannot be sustained if there be no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience.” (Emphasis supplied.)
Further, in explaining the term ‘ ‘ common experience ’ ’, the court pointed out that the experience must have a ‘ ‘ relation to the circumstances of life as we know them” (supra, p. 468). Using such criteria, the court properly held that a convicted *1065 criminal or fugitive from justice could not be presumed or expected to know that the firearm or ammunition was shipped in interstate commerce, merely by his possession thereof, since the inference that statute asked us to draw is not one in our ‘1 common experience ’ ’, it is not related to the 1 ‘ circumstances of life ’ ’ and is ‘1 inconsistent with any argument drawn from experience.” (Supra, p. 468.)
Yet, in Adams v. New York (192 U. S. 585 [1904]) a statute which made knowing possession of policy slips a crime and provided that mere possession should be presumptive evidence of “knowing ” possession, was declared valid; as was a statute which made mere possession of smoking opium presumptive evidence of knowing of its illegal importation, Yee Hem v. United States (268 U. S. 178 [1925]), both of which cases were cited in Tot. And, United States v. Gainey (380 U. S. 63 [1965]), held a statute valid which presumed an illegal distilling operation from the unexplained presence of one at a still. In the course of its holding, the court noted: ‘ ‘ Even if it found that the defendant had been present at the still, and that his presence remained unexplained, the jury could nevertheless acquit him if it found that the Government had not proved his guilt beyond a reasonable doubt.” (Supra, p. 70.) And further, “ The process of making the determination of rationality is, by its nature, highly empirical, and in matters not within specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and cull conclusions from it.” (Supra, p. 67; emphasis supplied.)
In Leary v. United States (395 U. S. 6, 36 [1969]) the court held invalid a presumption, which provides that a possessor of marijuana is deemed to know of its unlawful importation, since there was not “ substantial assurance that the presumed fact is more likely than not to flow from the proven fact on which it is made to depend.” The “ assurance ” is “substantial” if there is more than 50% indication that the presumed fact would probably flow from the proved fact. (People v. McCaleb, 25 NY 2d 394, 403 [1969].)
In People v. Terra (303 N. Y. 332, 334-335 [1951], app. dsmd. for want of substantial Federal question, 342 U. S. 938), Judge Fuld, writing for a unanimous court, also emphasized the importance of resorting to the knowledge gleaned from “ life’s experience ” in determining the existence of a rational connection between the fact proved and the ultimate fact presumed. The case held constitutionally valid subdivision 1-a of section 1897 of the old Penal Law, now section 265.15 of the Penal Law, which *1066 declared that the presence of a machine gun in any room was ‘ ‘ presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.” The court declared: ‘ ‘ The validity of a presumption statute, the permissibility of the presumption created, depend, therefore, upon whether, based on life ancl life’s experience, a rational connection between the fact proved and the ultimate fact presumed may be said to exist, [cases cited] * * * ‘ the fact upon which the presumption is to rest must have some fair relation to, or natural connection with the main fact > * * # (case cited); What is proved must be so related to what is inferred * * * as to be at least a warning signal”. (Emphasis supplied.)
Recently, our local Federal District Court (Rage Books v. Leary (301 F. Supp. 546 [S. D. N. Y., 1969]) was asked to rule on the constitutionality of subdivision 1 of section 235.10 of the Penal Law, which it refused to do as it did ‘1 not raise a substantial constitutional question.” And earlier, in East Village Other v. Koota (305 F. Supp. 1159 [E. D. N. Y., 1968]) the court refused to find that the presumptions in section 235.10 of the Penal Law contained any danger to constitutionally protected freedom of speech. And in Overstock Book Co. v. Barry (305 F. Supp. 842, 849 [1969]) Judge Anthony Tbavia was of the view that the presumption created by said subdivision 1 of section 235.10 “ comports fully with constitutional requirements” of Smith v. California (361 U. S. 147, supra): and Judge Frankel, in Milky Way Prods. v. Leary (305 F. Supp. 288, 297 [1969], affd. sub nom. New York Feed Co. v. Leary, 397 U. S. 98) indicates that the New York Legislature apparently had a firm, valid basis, well positioned in experience for the rationality of the presumptions of said section 235.10.
I disagree that the defendants cannot be presumed, to know, in general, the contents and character of the material they offer to sell and sell. Defendants’ contention violates common understanding’, but the contrary is “ a reasonable relation to the circumstances of life ” and within the context of “ common experience ” (Tot v. United States, 319 U. S. 463, supra). It is “ based on life and life’s experience ” (People v. Terra, 303 N. Y. 332, supra) to expect merchants to know something about the items they sell in their business, without expecting them to have examined each carefully. Is it farfetched, as defendants maintain, to presume that a bookseller or magazine vendor who sells obscene material in the course of his business knows something of its contents and character 1 I believe not, and to maintain such a position is to divorce oneself from the realities of 11 life’s *1067 experience “ No corner hardware merchant would long prosper ’ ’, remarks Richard H. Kuh in his interesting book (Foolish Fig Leaves? Pornography In-And-Out-of-Court. 1967, p. 264) “ lacking general familiarity with the items he had for sale. No Wall Street broker could succeed, ignorant of fluctuations in the securities he marketed. Similarly, honest book and magazine dealers have some general knowledge of the character of the wares they order, put on their shelves, sometimes display, and ultimately hope to sell.” The inferences created by said subdivision 1 of section 235.10 are predicated upon “ highly empirical ” determinates (United States v. Gainey, 380 U. S. 63, supra) and is constitutionally sustained because there is more than a 50% “ assurance ” that anyone selling or offering for sale obscene material in the course of his bookselling business has sufficient knowledge of the content and character of such material (Leary v. United States, 395 U. S. 6, supra; People v. McCaleb, 25 N Y 2d 394, supra). It is not unreasonable for the law to presume that the bookseller knows his merchandise, since to expect less would, as Mr. Justice Felix Frankfurter noted, permit the bookseller to insulate “himself against knowledge about an offending book” and “ thereby free to maintain an emporium for smut.” (Smith v. California, 361 U. S. 147, 161, supra.)
Nor, does this presumption create an unreasonable hardship upon defendants. The presumption is not conclusive; “ it gives him every opportunity to rebut the presumption * * * merely calling upon him to explain * * ®. And even if he offers no explanation, the jury may still refuse to convict. The burden of proof upon the entire case, the duty of establishing guilt beyond a reasonable doubt, remains as ever with the prosecution. Defendants’ right to a fair trial continues undiminished ; no hardship is imposed, no constitutional right or safeguard impaired.” (People v. Terra, 303 N. Y. 332, 337, supra. Also, Speiser v. Randall, 357 U. S. 513, 523-524 [1958] ; United States v. Gainey, 380 U. S. 63, 70, supra; Overstock Book Co. v. Barry, 305 F. Supp. 842, 849, supra; Rage Books v. Leary, 301 F. Supp. 546, supra; Ashford and Risinger, Presumptions, Assumptions, and Due Process in Criminal Cases, 79 Tale L. J. 165,173 [1969].)
The defendants urge upon the court the relevancy of Grove Press v. Evans (306 F. Supp. 1084 [E. D. Va., 1969]) as determinative of the constitutionality of our presumption. There the court considered the validity of a Virginia statute, which, while prohibiting the knowing possession of any obscene item with intent to sell, rent or commercially distribute it, presumes *1068 or deems, as a prima facie violation, the mere ‘1 possession in public or in a public place of any obscene item. ’ ’ The court held the statute unconstitutional in that it would impute to every possessor of such item, including an ultimate purchaser, the intent to sell, lend or commercially distribute it, and that, the court held (as did Leary, 395 U. S. 6, supra, under its facts) did not present the “ ‘ substantial assurance that the presumed fact [knowing possession with intent to sell] is more likely than not to flow from the proved fact [mere public possession of the obscene item] on which it is made to depend ’.” The court also noted that ‘ ‘ the presumption arbitrarily embraces a conscientious retailer who seeks to weed out, but nevertheless possesses, obscene publications delivered to him by his wholesaler or distributor.” [Supra, p. 1088.)
The Virginia statute differs from our subdivision 1 of section 235.10. There the statute presumes knowledge and an intent to sell from mere public possession of obscene material. Thus, a purchaser of one obscene item, merely possessing it in a public place, or the retailer, who merely possesses the item in his store, without intending to sell, is presumed to have knowledge and intention to sell. Mere possession of obscene material, without dissemination, is not subject to prosecution in our State. (People v. McGuire, 5 N Y 2d 523, 526 [1959]; People v. Russek, 49 Misc 2d 484, 486 [1966]; see, generally, Stanley v. Georgia, 394 U. S. 557 [1969].) It is possession and subsequent sale or possession with intent to sell which is condemned. (Penal Law, § 235.05; Gregory v. Ball, 25 Misc 2d 861, 866-867 [1960].) Our statute (§ 235.10, subd. 1) raises no presumption of knowledge, by mere possession of obscene material. The presumption is operable only if the material is actually sold (lent, delivered, etc.) in “ the course of his business ”, or if possessed with intent to sell (lend, deliver, etc.) “in the course of his business”, a vital ingredient absent in the Virginia statute. Accordingly, our presumption cannot operate against a private individual who sells or lends or delivers, etc. an obscene book to another, unless he does so “ in the course of his business ”, nor can it operate against a retailer who does not sell or intend to sell an obscene item in the course of his business. Both subdivisions 1 and 2 of section 235.10 are intended to raise presumptions against those in the business of regularly dealing in obscene material, either in large or small quantity, and as to them, there is a rationality and logic to the expectation that those who sell or intend to sell such material in the course of their business, know something of the character of the contents thereof. (Leary v. United States, 395 U. S. 6, supra.)
*1069 Having determined the constitutionality of the presumption, we address ourselves to the question whether defendants have adequately rebutted the same by demonstrating their lack of knowledge of the contents or character thereof.
Some history of the scienter requirement would place the facts here in perspective. As aforesaid, Roth v. United States (354 U. S. 476, supra) could be said to mark the beginning of a new legal concept in obscenity law. A short two years later, the court was faced with the argument by defendant, Eleazar Smith that he could not be convicted under a Los Angeles ordinance[7] merely for the possession of an allegedly obscene material[8] unless knowledge of its contents could be imputed to him, Smith v. California (361 U. S. 147 [1959]). Smith denied he read the offending book and stated that his shop carried thousands of books and he could not be reasonably expected to know the character of the contents of each or most of them — the same argument made in the instant case. The court reversed the California Superior Court (People v. Smith, 161 Cal. App. 2d 860), unanimously,[9] (believe it or not), and held that mere possession, without the showing of ‘ ‘ knowledge of the contents of the book on the part of the seller ” (supra, p. 153) was an unconstitutional requirement.[10] What degree of knowledge is required? The majority attempted to answer when it stated, “ Eyewitness testimony of a bookseller’s perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was aware of what a book contained, despite his denial.” (Supra, p. 154.) Although it required some degree of scienter, the court refused to pass upon ‘ ‘ what sort of mental element is requisite to a constitutionally permissible prosecution.” (Supra, p. 154.) Mr. *1070 Justice Frankfurter took the majority to task for apparently avoiding the scope and quality of scienter that is required, but confirmed that the majority does not require ‘1 that a bookseller must familiarize himself with the contents of every book in his shop. No less obviously, the Court does not hold that a bookseller who insulates himself against knowledge about an offending book is thereby free to maintain an emporium for smut ”. (Supra, p. 161.) The court’s position was reiterated in Manual Enterprises v. Day, 370 U. S. 478, 491-494 [1962]; Mishkin v. New York, 383 U. S. 502, 511, supra. Then, it is the circumstances of the defendants’ connection with the offending material that we must look to. And so in People v. Finkelstein (11 N Y 2d 300, 304 [1962], cert. den. 371 U. S. 863) the circumstances there that each defendant voluntarily admitted he had seen worse books than the material in questiou, the lurid statements on the cover, the $5 price per copy stamped on the cover, all taken together, indicated scienter beyond a reasonable doubt. And in People v. Hartman (23 N Y 2d 778, 779 [1968]) the lurid cover and notation (as here) “ Adults Only ” thereon, a price of $1.50 per copy, and that defendant worked regularly at the store indicated defendant had 1 ‘ reason to know ’ ’ the character of the contents.
The circumstances here clearly indicate that the defendants have not satisfactorily rebutted the presumption raised by subdivision 1 of section 235.10 of the Penal Law. They claim that their stores maintain thousands of volumes on many subjects, and magazines such as Zap No. 4 constitute less than 1% of the gross yearly sales. But proof of scienter requires focusing on the particular material in question and not solely on the many other unoffending titles on the shelves. “ No book or picture is to be deemed known by either the company it keeps or by the company that keeps it ” (Kuh, Foolish Figleaves, supra, p. 113). Further, since defendant sold so few magazines or other material of the character of Zap No. 4, it is not unreasonable to expect the likelihood that they could, and did, become more readily familiar with Zap No. 4 than with any of the thousands of visually similar hard or paperback volumes. Zap No. 4 would stand out like a sore thumb under such circumstances.
Defendant Dargis is and has been the manager of the Bast Side Bookstore; he is the only employee authorized to make purchase of merchandise; he purchased Zap No. 4 for the store and prior thereto purchased four other issues of the magazine; and, upon their receipt, unpacked and positioned them on the shelf assisted by another; he personally sold 20 to 25 copies of Zap No. 4; he had glanced at “ the ending pages ” of Zap *1071 No. 4 “ one time or so he had looked at the cover with its admonition for “ Adults Only Copies of this magazine were in conspicuous view in a showcase immediately in front of a platformed counter, behind which Dargis was stationed at the time of the sale. Defendant, Kirkpatrick, is, and has been for about one year, co-manager of the New Yorker Book Shop. He does billing, accounting, makes reorders and sells in the store; he personally had sold 25 to 30 copies of Zap No. 4; and the store had sold all four prior issues of Zap of 150 copies each.
Such facts are similar to those presented in People v. Weingarten (50 Misc 2d 635, 640, affd. 55 Misc 2d 681, revd. on other grounds 25 N Y 2d 639)[11] and were held there, as I hold the stated facts here, to constitute sufficient knowledge by the defendants, Dargis and Kirkpatrick, of the contents and character of Zap No. 4, although they may have never read through it.
Further, the defense urges that by merely introducing the alleged offending material and then claiming its violation of section 235.05 of the Penal Law, as a matter of law, the prosecution has failed to maintain its burden of proving obscenity beyond a reasonable doubt, and in order to appropriately do so, the prosecution must present evidence, by testimony or otherwise, independent of the material, which demonstrates the legally obscene character of the writing and its utter lack of redeeming social significance (Penal Law, § 235.00, subd. 1). Is that position valid?
There is now no question that expert testimony, attempting to delineate community literary standards, or whether the dominant theme appeals to the prurient interest in sex of Mr. Everybody, or the nature of the material’s social redeeming quality, if any, is certainly permissible, and must be evaluated (Smith v. California, 361 U. S. 147, supra, concurring opinion of Justice Frankfurter ; Memoirs v. Massachusetts, 383 U. S. 413, 427, supra, concurring opinion of Justice Douglas ; People v. Richmond County News, 9 N Y 2d 578, 584 [1961]. Eingel, Obscenity Law Today [1970] pp. 110-111.) It had not always been so.[12] The question is what weight shall be placed upon such testimony and is it required in all cases.
*1072 The determination of obscenity involves not simply a question of fact, but “ a mixed question of fact and constitutional law ’ ’ which calls upon the courts, at each level of the judicial process, to appraise in the light of State and Federal constitutional requirements. (Roth v. United States, 354 U. S. 476, 497-498, supra; Kingsley Int. Pictures Corp. v. Regents of Univ. of State of N. Y., 360 U. S. 684, 708 [1959]; Manual Enterprises v. Day, 370 U. S. 478, 488, supra; Jacobellis v. Ohio, 378 U. S. 184, 188, 190 [1964]; People v. Richmond County News, 9 N Y 2d 578, 581, supra; People v. Fritch, 13 N Y 2d 119, 124 [1963]; People v. Weingarten, 50 Misc 2d 635, 636, supra; Lockhart & McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 114-116 [1960-].)
In arriving at such determination, the court must allocate the weight to be placed upon any expert testimony, considering the quality and cogency thereof, but assigning no importance to merely the number of such experts testifying for one or the other side. In the final analysis, the court must be the expert in assessing what is the dominant theme, prurient interest, community standards, any redeeming social value, and the like. (O. Rogge, The High Court of Obscenity, 41 U. Col. L. Rev. 1, 25 [Feb., 1969].) This decision is solely for the court, and it may not permit the usurpation of that function by the “ expert ” or by the jury. (Memoirs v. Massachusetts, 383 U. S. 413, 450, 462 supra; United States v. A Motion Picture Film (I Am Curious-Yellow), 404 F. 2d 196, 204 [1968].)
However, we are reminded that in United States v. Klaw (350 F. 2d 155, supra) where the prosecution, as here, introduced no expert witnesses but merely the offending material, the majority held for acquittal and required as a prerequisite to conviction, the introduction of expert testimony by the prosecution to show “ what does or does not appeal to the prurient interest of the average person” (supra, p. 167). (See, also, Hudson v. United States, 234 A 2d 903, 906 [1967]). I am not persuaded of the necessity of such requirement in every case, and decidedly not in a case where the material is ‘ ‘ patently offensive ’ ’ (i.e. hard-core pornography), as the prosecution claims it to be in the instant case. (Womack v. United States, 294 F. 2d 204, 206 [1961], cert. den. 365 U. S. 859; United States v. Wild, 422 F. 2d 34, 36 [C. C. A. 2d, 1969].)
“ Klaw is a special type of case from which no general rule can be deduced ” (Ringel, Obscenity Law Today, supra, p. 107) and it must be limited to the sadomasochistic type of material there involved, which is aimed at the sexual deviant. In such a case expert testimony may very well be required to demon *1073 strate whether the material appeals to the prurient interest in sex of that deviant segment, which knowledge would not be within the experience of a jury or Judge. (United States v. Wild, supra, p. 35.)
Certainly, with respect to other material where, upon close examination the legal criteria involved may not be readily ascertainable or applied to the accused material, it would behoove the prosecution, in aid of the court and jury, to secure the assisting testimony of experts, lest he fail to prove his case beyond a reasonable doubt. Except perhaps in a Klaw situation, experts, although possibly helpful to a fuller understanding, are not a required concomitant to a successful prosecution. (United States v. 392 Copies of Magazine Entitled “ Exclusive ”, 253 F. Supp. 485, 493 [1966][13]; United States v. Davis, 353 F. 2d 614, 615 [C. C. A. 2d, 1965], cert. den. 384 U. S. 953; People v. Finkelstein, 11 N Y 2d 300, 306-307 [1962][14].)
Having come thus far, we are next plunged into a maelstrom of doubt, confusion, indecision, frustration and near chaos — for I must determine that ‘1 mixed question of fact and constitution law ” — that is obscenity, and its relationship to the accused material {Zap No. 4).
The long-enduring and vigorous debates on the question whether any written or other media of communication should be restricted in publication and distribution in the light of the First and Fourteenth Amendments, and, if so, to what extent, remains, and probably will forever remain, unresolved.[15] The debate *1074 although invigoratingly interesting, is nevertheless academic, since obscenity is judicially declared as but one, of several exceptions,[16] to the apparently unqualified prohibition of the First Amendment — ‘ ‘ Congress shall make no law * * * abridging the freedom of speech, or of the press. ’ ’
11 Obscenity is not within the area of constitutionally protected speech ”, because it is “ utterly without redeeming social importance.” (Roth v. United States, 354 U. S. 476, 484-485, supra.)
What then constitutes obscenity? The answer to that question is distressingly elusive and has, in the main, resulted in all the confusion hereinabove discussed. It can perhaps be characterized in Churchill’s terms, as “ a riddle wrapped in a mystery inside an enigma ”.[17] We are told in Roth (supra, pp. 491 and *1075 495) and repeatedly elsewhere, that — obscenity statutes and the term “ obscenity ” do not lend to precise definition.[18] One commentator believes “ There is no definition of the term. There is no basis of identification. There is no unity in describing what is obscene literature, or in prosecuting it. There is little more than the ability to smell it.” (Alpert, Judicial Censorship of Obscene Literature, 52 Harv. L. Rev. 40, 47 [1938]).[19] This failure at objective delineation, has not, however, inhibited the Supreme Court, because it notes the term leads “ sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices ”. (Roth v. United States, supra, p. 491.) With such reasoning that court apparently had no problem, it says, in smelling out what is “ ‘ obscene, lewd, lascivious, or filthy, * * * or other publications of an indecent character. ’ ” It would appear that the five noses of the majority of that court[20] are more keenly sensitive than those of Mr. Justice Warren (Jacobellis v. Ohio, 378 U. S. 184, 199, 201, supra), or Mr. Justices Douglas and Black, who are anosmatic in all areas of obscenity. (Roth v. United States, supra, p. 514; Ginzburg v. United States, 383 U. S. 463, 478-481 [1966].) Many others are similarly impotent.[21] But in spite of its inability to adequately define obscenity, the court, in Both v. United States, supra, p. 489, nevertheless, had no hesitancy in establishing a “ test ” to recognize it. That test requires the simple mental gymnastics of ascertaining ‘ ‘ whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.” It was not too long that this ‘1 guideline ’ ’ was amended in 1966 in several respects and by *1076 several cases decided the same day. Only the following are relevant here.[22]
A. In Memoirs v. Massachusetts (Fanny Hill) (383 U. S. 413, 418-419, supra) the court said that each of the following three elements must “ coalesce ” and “ he applied independently ”, to establish prohibited obscenity — “(a) the dominant theme of the material taken as a whole appeals to a prurient interest in seco; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters,[23] and (c) the material is utterly without redeeming social value ”[24] (emphasis supplied).
B. In Mishkin v. New York (383 U. S. 502, 508) it declared that where a publication ‘ ‘ is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large ”, it is obscene if it appeals to the prurient interest of that group. (See, also, One, Inc. v. Olesen, 355 U. S. 371 [1958].)
Earlier, in 1964, the court had interpreted “contemporary community standards ” as that “ determined on the basis of a national standard ” and not merely on any local basis (Jacobellis v. Ohio, 378 U. S. 184, 192, 195, supra.) This ruling would require a local court to do no less than determine the community standards of the various areas of the country — the urban, the rural, the suburbs; and the capacities of our citizens — the rich, the poor, the educated and the illiterate, and arrive at some average national standard. The difficulties created by Jaeobellis are almost insurmountable.[25]
*1077 Section 235.05 of the Penal Law is an attempt by the New York Legislature to codify the definition of obscenity as expressed in Memoirs (People v. Stabile, 58 Misc 2d 905 [1969]).
With the advent of pivotal Redrup v. New York (386 U. S. 767 [1967]) and its subsequent application, we can discern a more distinct and objective meaning to the term ‘ ‘ obscenity ’ ’ and the intentions of the Supreme Court. The court, in Redrup, and almost consistently since, seems to have equated “ obscenity ” with “hard-core pornography” (Luros v. United States, 389 F. 2d 200, 205 [C. C. A. 8th, 1968]), and this, in spite of the fact that it had previously indicated that the Roth test and hardcore pornography were not the same, but rather the latter ‘1 delimits a narrower class of conduct than that delimited under the Roth definition ”. (Mishkin v. New York, 383 U. S. 502, 506, supra.)
Redrup points out that the hard-core pornography test, consistently adopted by Justice Stewabt (Redrup v. New York, 386 U. S. 767, 770-771 supra; Jacobellis v. Ohio, 378 U. S. 184, 197, supra; Ginzburg v. United States, 383 U. S. 463, 499, supra) is “ not [a] dissimilar standard ” to the Roth-Memoirs test. If we view this statement in the light of the positions taken by the court in many obscenity cases since Redrup and in the light of the history of Roth, it would appear that the Supreme Court has and will continue to condemn only that material which is clearly hard-core pornography, absent a sale to minors, pandering or an assault upon individual privacy as to make it impossible for the individual to avoid exposure to the allegedly obscene matter.
Roth was not concerned with the possible obscenity of the publication, “ American Aphrodite ”, the only one (of the many items in issue) found obscene in the court below. It was concerned only with certain questions relative to the constitutionality of the statute involved.[26] During the course of its deliberations, the Solicitor-General, gratuitously, sent to the court a cartoon of admittedly hard-core material to demonstrate the meaning of some of his arguments before the court. Many are of the view that in declaring the Aoi/i-prurient appeal test, the court had in mind the hard-core material before it. (Lockhard & McClure, Censorship of Obscenity — The Developing Consti-
*1078 tutional Standards, 45 Minn. L. Rev. 5, 25-26, supra; O. Rogge, The High Court of Obscenity I, 41 U. Col. L. Rev. 1, 5.) Dean Lockhard and Professor McClure were convinced as early as I960, when they wrote their extraordinary article (supra), that most of the members of the Supreme Court equated obscenity with hard-core pornography, without expréssly saying so and that it would eventually limit its condemnations to that class (supra, pp. 74, 79). Redrup, and the many Supreme Court obscenity cases since then, most of them reversals of the lower courts, seem to fulfill that prediction.[27]
*1079 In New York, and prior to the adoption of subdivision 1 of section 235.05 of the Penal Law, hard-core pornography was the sole class of material declared impermissible (People v. Richmond County News, 9 N Y 2d 578, 586 [1961]; People v. Weingarten, 25 N Y 2d 639 [1969]). It was deemed to delimit a narrower class of material and was a more stringent test than under the Federal — Roth-Memoirs guideline (Mishkin v. New York, 383 U. S. 502, 506, supra; People v. Richmond County News, supra, p. 594). Others believe that with the adoption of subdivision 1 of section 235.05 of the Penal Law, the hard-core pornography test had been discarded and inapplicable in our State as the sole test. (People v. Stabile, 58 Misc 2d 905.) The question now is asked — and the answer hopefully will be supplied by our high courts — whether or not, in view of Redrup and its great supporting progeny, and the present position of our forever modulating social standards, hard-core pornography alone goes substantially beyond our present limits of candor (Penal Law, § 235.00, subd. 1).
There is much to commend the hard-core pornography test as a sole test. In spite of Justice Warren’s comment — “But who can define 1 hard core pornography ’ with any greater clarity than 6 obscenity ” (Jacobellis v. Ohio, 378 U. S. 184, 201, supra); many believe the hard-core pornography test to be an objective one, since the material speaks for itself. (Bingel, Obscenity Law Today, p. 79.) It is “ patently offensive ” and its “indecency speaks for itself” (Memoirs v. Massachusetts, 383 U. S. 413, 457, supra; Womack v. United States, 294 F. 2d 204, 206, supra). Justice Stewart would describe it as material 1 ‘ with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character ’ ’, and at times in exaggerated fashion (Ginzburg v. United States, 383 U. S. 463, 499, n. 3, supra). D. H. Lawrence, the author of Lady Chatterly’s Lover, would recognize it “by the insult it offers, invariably, to sex and to the human spirit. Pornography is the attempt to insult sex, to do dirt on it. ® * * Such material is an * * * insult to the human body, the insult to a vital human relationship. Ugly and cheap they make the human nudity; ugly and degraded they make the sexual act, trivial and cheap and nasty ” (Pornography and Obscenity in Sex, Literature and Censorship, pp. 74-79 [1953]). Hard-core ‘ ‘ focuses predominantly upon what is sexually morbid, grossly perverse and bizarre * * * depicting dirt for dirt’s sake, the obscene is the vile, rather than the coarse, the blow to sense, not merely to sensibility. It smacks, at times, *1080 of fantasy and unreality, of sexual perversion and sickness ”. (People v. Richmond County News, 9 N Y 2d 578, 587, supra [1961].) Such pornography has as its primary aim “ to shock, revolt, or embarrass by explicitly depicting sexual intimacies — especially those of a loveless, perverse or brutal kind — and other works that horrify with vivid details of nonsexual brutality ” (B. Spock, Decent and Indecent [1969], p. 87).
Aside from the fact that hard-core pornography appears more readily definable and recognizable, it has the added advantage as a test in that no expert testimony is required since it is legally condemnable as if res ipsa loquitur. (United States v. Klaw, 350 F. 2d 155, 167, supra; Womack v. United States, 294 F. 2d 204, 206, supra; Hudson v. United States, 234 A. 2d 903, 906 supra.)
WHO ABE THE SOPHISTICATED1?
Is there any merit to the claimed-defense that, since Zap No. 4 was intended (and their experts unanimously so testified) for a particular recipient group, namely, those enjoying “unusual sophistication ’ ’, rather than the public at large, the magazine, under authority of Mishkin (383 U. S. 502, supra) could not be deemed obscene, since it does not appeal to prurient interest of that group. Mishkin involved material intended for a 1 ‘ defined deviant sexual group ”, namely, homosexuals. Certainly, defendants are not prepared to concede that a sophisticated person is readily identifiable as a member of some, deviant sexual group, and yet the Mishkin exception would apply to sexual deviants. Nor was Zap No. 4 intended for any other readily defined group “ such as physicians or psychiatrists, who might independently discern the book’s therapeutic worth ” (Ginzburg v. United States (383 U. S. 463, 469-470 [1966]). Nor was it intended for “persons or institutions having scientific, educational, governmental or other similar justification for possessing or viewing the same ”. (Penal Law, § 235.15; United States v. 31 Photographs, 156 F. Supp. 350, 357-358 [S. D. N. Y., 1957].) The solicitation for Zap No. 4 was not limited; it was sold to the general public through bookshops, which encouraged it to enter and buy its wares, including Zap No. 4. Merely because the magazine in question does not appeal to the prurient interest of the sophisticated or other small group of intellectuals does not remove it from the prohibitions of section 235.00 et seq. of the Penal Law. To do so would permit the substitution of the opinions of defendants’ sophisticated and intellectual experts for those of the average person in the contemporary community. (People v. Fritch, 13 N Y 2d 119, 125, supra.) “ Material dis *1081 tributed to the public at large may not be judged by its appeal to the most sophisticated, nor by its appeal to the most susceptible. ’ ’ (United States v. 31 Photographs, supra, p. 355.) The “ sophisticated ’ ’ is certainly not a defined group within the purview of Mishkin, and to which class the ‘ ‘ average adult ’ ’ pridefully will claim to belong.
IS ZAP NO. 4 LEGALLY OBSCENE?
Before embarking upon that herculean task, I have reflected upon the host of cases which have admonished against the scourge of subjectiveness and predilection.[28] Can we so act totally free of it, in an area of jurisprudence, readily admitted, to be fraught with such continuing, deep indecision and confusion in all courts. Can we do so when our moral fibre remains in such swirling flux, changing from year to year; when the simple truths of yesterday become today’s old rejections, and identifiable mores and recognition of present social values elude us as the fleeting butterfly. In this light, lacking clear or even adequate decisional guidance, the Judge, in an obscenity case, finds it painfully difficult, if not impossible, to substantially divorce himself from his lay experience and heritage, and to expect it fully is to deny truth and reality. With immaculate intentions, he may, nevertheless, find himself unconsciously making determinations on this subject of ethereal substance, which have a basis in his individually deep rooted social history. These then are the dangers the jurist recognizes, while determining the possible obscenity of the accused material, and the struggle against them requires extraordinary determination. The dangers, however, would also include an avoidance — “ To win the stamp of approval as defenders of civil rights and liberties we ought not *1082 over-react to the pressures and fashions of the day.” (Rage Books v. Leary, 301 F. Supp. 546, 550, supra.) It also requires the uneasy courage of expressing common moral standards no less than the courage for innovation.[29]
Zap No. 4 does not involve a sale to minors (Penal Law, §§ 235.20, 235.21; Prince v. Massachusetts, 321 U. S. 158, 168 [1944]; Jacobellis v. Ohio, 378 U. S. 184, 195 supra; 30 Albany L. Rev. 133 [1966]), or pandering (Ginzburg v. United States, 383 U. S. 463, 470, supra); or “ any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it.” (Redrup v. New York, 386 U. S. 767, 769 [1967].)
Zap No. 4 is a small-sized cartoon type magazine, measuring about 7 inches by 10 inches. The cover is multicolored, with a distorted figure depicted, and in the upper right hand corner appear the words “ Adults Only ” in bold type; while the price of 50 cents appears in the upper left corner. It contains 50 pages of cartoon-like drawings, with dialogue drawn, as in other cartoons, from the mouths of individual speakers. The first seven pages of cartoons, including one on the inside of the cover, is totally unrecognizable in' meaning either by the dialogue or by the juxtaposition of the figures. The “ artist ” is not named. It is innocuous and meaningless, although it depicts, on several pages, a nude woman, revealing her breasts and pubic hair. That, in and of itself, apparently is permissi-. ble. (Mounce v. United States, 355 U. S. 180 [1957]; Sunshine Book Co. v. Summerfield, 355 U. S. 372 [1958]; Conner v. City of Hammond, 389 U. S. 48 [1967].) Some of the cartoon pictures indicate dialogue of the well-known four letter words, often unconnected in meaning with reference to the activity of the pictures. The words alone are legally innocuous. (Grove Press v. Christenberry, 276 F. 2d 433 [C. C. A. 2d, 1960].)
The second set of cartoons, intended apparently to be organized in story form, numbers six pages, and is entitled “ Joe *1083 Blow ’ ’. It is drawn by Robert Crumb.[30] One of the defendant’s experts calls it an “ Oedipal fantasy ”, while other of the experts declare the redeemable idea or theme to be a “ satire on sexual fantasies people entertain ” or a “ parody on family life” or “ a satire in togetherness of family”. Of course, if the contents convey to “ ordinary adults ” some meaningful and recognizable idea of social value, nothwithstanding its general unacceptability or unpopularity, it may be rescued or redeemed from otherwise condemnable obscenity. (Penal Law, § 235.00; Memoirs v. Massachusetts, 383 U. S. 413, 418, supra ; Kingsley Int. Pictures Corp. v. Regents of Univ. of State of N. Y., 360 U. S. 684, 688 [1959].) But here, I cannot discern any genuine idea. It depicts incest between father and daughter, clearly showing the sexual act, as well as oral sodomy between them, also suggested incest between mother and son and sister and brother. The father’s penis is clearly shown and erect, as well as the mother’s breasts. Doctors Phyllis and Eberhard Kronhausen, no friends of obscenity laws, 'but who recognize certain material as contemptible and illegal 11 hardcore obscenity ”, would assign to that classification, incestuous relations consummated with no sense of guilt and of parent figures who initiate and participate in the sexual activities of their children. (Kronhausen, Pornography and the Law, 1959, pp. 207, 211.) It is this kind of material which is “the attempt to insult sex, to do dirt on it.” (D. H. Lawrence, Sex, Literature and Censorship, supra p. 69.) The cartoon is ugly, cheap and degrading. Its purpose is to stimulate erotic responses, and it does not, as claimed, deal with basic realities of life. It is grossly shocking, demeaning the sexual experience by perverting it. (Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 65-66, supra.)
“ Sex and obscenity are not synonymous ” (Roth v. United States, 354 U. S. 476, 487, supra) but the “graphic depiction of sexual activity” is condemned as obscene (People v. Noroff, *1084 67 Cal. 2d 791, 794 [1967]; People v. G. I. Distrs., 20 N Y 2d 104, 107 [1967], cert. den. 389 U. S. 905; Ginzburg v. United States, 383 U. S. 463, 499, supra; People v. Bercowitz, 61 Misc 2d 974, 977-978 [1970]; A. B. Gerber, Sex, Pornography and Justice [1965], p. 287). Zap No. 4 is replete with such activity. The whole of each of these items (i.e., cartoon stories) in Zap No. 4 must be considered separately (People v. Richmond County News, 9 N Y 2d 578, 580, supra) and in doing so, I determine that this item is patently offensive .and falls clearly within the ambit of the prohibitions of section 235.00 et seq. of the Penal Law and the cases.
The next cartoon story, meaningfully entitled “A Ball in the Bung Hole, A Study in Decay,” by S. Clay Wilson, conceded by one of defendants’ witnesses as “erotic material ”, depicts a male’s erect genitalia, exaggerated in size, masturbation, foreplay by a male with female genital organ, a willing female ready for seduction, oral sodomy, all enlivened with descriptive language and four-letter words. “The Supreme Constellation of Dormasintoria ’ ’, the next cartoon on four pages, by “ artist ” Robert Williams, says nothing and means less, except to show a woman’s vaginal area. As to “ Wonder Wart-Hog ”, by Gilbert Shelton, on six pages, it was described by one of the defendants’ witnesses as having no message but contained good drawings; while another defendants’ witness thought it was a ‘ ‘ parody on superman ’ ’. There are no significant ideas here, there is but filfth, fornication in explicit terms and shock. If there is any attempt at real humor, it is submerged in perversion and perhaps would escape all reasonably experienced persons. And so with almost each of the other series of cartoon stories, there are explicit sexual activity and perversion of many sorts; with bizarre exaggerations of the male sex organs; with clear depiction, in some, of copious amount of seminal fluid ejaculation; with ideas (and I can discern little) demeaning to normal experiences. It is dirt for dirt’s .sake. And so with the centerfold, with its bizarre drawings of oral sodomy, exaggerated size and erect male organs and seminal ejaculation; and with cartoon “Mr. Natural” depicting sexual intercourse (mild in comparison to the other cartoons); or with cartoon entitled “ Leather Tits ”, again with genitalia shown in grotesque form, in which one of defendants ’ sophisticated experts failed to see any meaning; or “Horny Harriet”; which is a lesson in bestiality. And so with almost all of the cartoon stories — they focus “ pre *1085 dominantly upon what is sexually morbid, grossly perverse and bizarre * * * It smacks * * * of fantasy and unreality, of sexual perversion and sickness and represents * * * ‘ a debauchery of the sexual faculty’”. (People v. Richmond County News, 9 N Y 2d 578, 587, supra.) “It thus went beyond accounts of 1 normal sexuality ’ ” (People v. Weingarten, 55 Misc 2d 681, 682 [1967]). Its emphasis is upon the grossly perverse, exaggeration and bizarre. It is “material sordid, shocking and debasing of sex.” (People v. Bercowitz, 61 Misc 2d 974, 981, suprg,.) As to almost each of the items and as to the magazine as a whole, its dominant theme is “ indisputably pornographic, indisputably obscene and filthy ”, and has the “leer of the sensualist”. (Ginzburg v. United States, 383 U. S. 463, 468, supra; Brown v. Kingsley Books, 1 N Y 2d 177, 180 [1956].) It is material ut'terly unredeemed and unredeemable, save, perhaps, only by the quality of the paper upon which it is printed. It is patently offensive (Memoirs v. Massachusetts, 383 U. S. 413, supra). It has gone substantially beyond ‘ ‘ the present critical point in the compromise between candor and shame at which the community may have arrived here and now ” (United States v. Kennerley, 209 F. 119, 121 [1913]). It is a part of the underworld press — the growing world of deceit in sex and it is not reality or honesty, as they often claim it to be. It represents an emotional incapacity to view sex as a basis for establishing genuine human relationships, or as a normal part of human condition. It is, what Dr. Benjamin Spock characterizes as “ shock-obscenity ”, representing a brutalizing trend in our society. (Spock, Decent and Indecent, supra, pp. 83-84.) The development of understanding of, or making proper comment about, sex is vitiated by its graphic and venal exploitation of sexuality. And such exploitation is an unfortunate concomitant of our times.[31] Zap *1086 No. 4 is an exploiter; its effect is to purvey “ filth for filth’s sake (State of Ohio v. Jacobellis, 173 Ohio St. 22, 28 [1962].) It is hard-core pornography. Perhaps that type of obscenity contains its own antidote and eventually becomes a repetitious bore — but, unfortunately by that time it has rendered its victims shock-proof, jaded and permissive to the point of indifference toward moral values and tolerable behavior. The material must fail by any legal test yet announced, including subdivision 1 of section 235.00 and section 235.05 of the Penal Law, and stands condemned as a violator of that law. The magazine is legally obscene.
The contention of defendants, that the drawers of the cartoons are recognized “ artists ” and their work is redeemed and has social value by virtue of their proven artistry, is not meritorious. A Michelangelo could find no solace from legal restraint if his art be obscene. “ This court will not adopt a rule of law which states that obscenity is suppressible but well-written [or well drawn] obscenity is not.” (People v. Fritch, 13 N Y 2d 119, 126, supra [matter in brackets added].) Nor will “ a truly pornographic film * * * be rescued by inclusion of a few verses of the Psalms.” (United States v. A Motion Picture Film [I am Curious-Yellow], 404 F. 2d 196, 201, supra.)
Defendant, Terrence McCoy is acquitted. Based on the testimony that the arrest warrant describes the seller as one having physical characteristics substantially different than that of McCoy; that the records of the bookshop indicate, and its manager testified, that McCoy was not working on the day of the sale, and McCoy’s own denial of his presence and of the sale, I have reasonable doubt as to his guilt.
In view of the above, I further find that the People have proved a prima facie case, and further, upon the whole case, that defendants, Charles Kirkpatrick and Peter Dargis are guilty as charged, beyond a reasonable doubt.

. The charges against defendants, Peter Martin and James Rose, the owners of the two book shops in which the purported obscene material was allegedly sold, were dismissed prior to the commencement of trial, on motion of the prosecution, upon the grounds that knowledge of the materials’ contents could not be imputed to them beyond a reasonable doubt.

. (Besig v. United States, 208 F. 2d 142 [C.C.A. 9th, 1953]; People v. Fritch, 13 N Y 2d 119 [1963]; State v. Huntington, No. 24657, Super. Ct. Hartford County, Conn. [1962]; Grove Press v. Florida, 156 So. 2d 537 [Fla. Dist. Ct. App., 1963]; Haiman v. Morris, Ill. Sup. Ct. June 18, 1964, No. 37276; Commonwealth v. Robin, No. 3177, C.P. Phila. County, Penn. [1962].)

. (Zeitlin V. Arnebergh, 59 Cal. 2d 901 [1963-unanimous], cert. den. 375 U. S. 957; Attorney General v. Book Named “ Tropic of Cancer ”, 345 Mass. 11, [1962 4-to-3 decision] ; McCauley v. Tropic of Cancer, 20 Wis. 2d 134 [1963 4-to-3 decision].)

. (Commonwealth v. Holmes, 17 Mass. 336 [1821].)

. (Commonwealth v. Sharpless, 2 S. & R. 91 [Pa., 1815].)

. Others also argue that only “ actual knowledge ” is required and not presumed knowledge, and thus section 235.10 of the Penal Law is unconstitutional. (30 Albany L. Rev. 133,137 n. 27.)

. Los Angeles, Calif. Municipal Code, § 41.01.1.

. The book involved was Sweeter Than Life by Mark Tryon, dealing with lesbianism.

. They could not agree on a common ground. Justice Brennan wrote for the majority, joined by Justices Warren, Clark, Stewart and Whittaker. Justice Frankfurter wrote a concurring opinion, as did Justice Harlan, who dissented in part. Justices Black and Douglas each wrote concurring opinions, consistent with their long-held position — no censorship of any kind, even for obscene material.

. In People v. Finkelstein (9 N Y 2d 342 [1961]; cert. den. 371 U. S. 863) the court held that section 1141 of the old Penal Law (predecessor to section 235.05 of the present Penal Law) implicitly required the showing of some degree of scienter for a conviction, and that requirement was inherent or “instinct” in the definition of the obscenity crime, although that section did not expressly require the prior showing of knowledge. (Also, People v. Bunis, 23 Misc 2d 156, 158 [1960]; People v. Kahan, 15 N Y 2d 311 [1965]; People v. Russek, 49 Misc 2d 484, 486 [1966].)

. There, the offending books were all 15 feet from where the defendant sat. He had worked in the store for more than two years and took inventory; he sold books from the rack on which the book in question was situated, and he put books on the shelves. This demonstrated, said the trial court, that “He certainly had enough knowledge of what he was distributing * * * even though he never read the book.” (supra, p. 640).

. (People v. Muller, 96 N. Y. 408, 412 [1884]; Halsey v. New York Soc. for Suppression of Vice, 234 N. Y. 1, 7 [1922]; People v. Wepplo, 78 Cal. App. 2d 959, 962-963 [1947].)

. Here the Federal District Court (Maryland), in explaining the meaning of Klaw, draws a distinction between those items which “ may be so esoteric as to require expert testimony ” whereas,“ other stimuli * are so elemental that the ordinary judge or juror should be able to recognize the nature of their appeal to the average man.” (supra, p. 493.)

. The defense’s expert testimony must be viewed in the light of their own prejudices, since they are rarely shocked by anything they see or read. (B. Spoek, Decent and Indecent, 1969 (p. 84). On the other hand, those who may condemn material as obscene for the People, may have similarly obdurate sentiments concerning obscenity. Accordingly, a court will not profit merely by the “use of witness nose counts (no matter how eminent the faces behind the noses) in determining whether an item may be redeemed by some artistic or other social values.” (Kuh, Foolish Figleaves?, supra, p. 207.)

. There are those, concurring with Justices Black and Douglas, who maintain that there is no scientific evidence that antisocial conduct results from exposure to obscene material; that “Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it ” (Douglas dissent, Roth v. United States, 354 U. S. 476, 514, supra); and that the First Amendment is unqualified and forecloses any exception.
Of course, the contrary view sees a relationship between obscenity and antisocial conduct; or sees a need to protect society’s moral fibre from certain type *1074 of obscenity, such as hard-core pornography. This view would give added credence to Justice Holmes’ position that “every idea is an incitement” (Gitlow v. New York, 268 U. S. 662, 673 [1925]) and particularly an unmistakenly obscene one. “Sticks and stones may break your bones,” and contrary to the belief of some, say these proponents, “obscenity, by words or otherwise, will also harm you.” See as to both views: (Commonwealth v. Gordon, 66 Pa. D. & C. 101, 110 [1949], affd. sub nom. Commonwealth v. Feigenbaum, 166 Pa. Super. Ct. 120 [1950], containing an extraordinary opinion by Judge Curtis Bok; Beauharnais v. Illinois, 343 U. S. 250, 267-275 [1952]; United States v. Roth, 237 F. 2d 796, 806-827 [C.C.A. 2d, 1956-concurring opn. of Judge J. N. Prank]; Smith v. California, 361 U. S. 147, supra; Ginsberg v. New York, 390 U. S. 629, supra; Ginzburg v. United States, 383 U. S. 463, supra; Mishkin v. New York, 383 U. S. 502, supra; dissents of Justices Black and Douglas therein; People v. Richmond County News, 9 N Y 2d 578, 582-584, supra; People v. Bercowitz, 61 Misc 2d 974, 979-981 [1970]; Gerber, Sex, Pornography and Justice [1965], pp. 194-215; Kuh, Foolish Figleaves?, Pornography in-and out of-Court [1967], pp. 13-14; O. Rogge, The High Court of Obscenity I, 41 U. Col. L. Rev. [Feb., 1969], pp. 7-10, 41 also The High Court of Obscenity II, 41 U. Col. L. Rev. [May, 1969], pp. 220-229, 254; B. Spook, Decent and Indecent, [1969], p. 85.) Time Magazine of Sept. 28, 1970, p. 43 notes that pornography “never corrupts anybody who isn’t already depraved.” Further, the report of the majority of the Federal Commission on Obscenity and Pornography, released Sept. 30, 1970, declares that pornography is not harmful to adults and all legal controls on adults are unnecessary (The New York Times, Oct. 1, 1970, p. 20). However, on October 13, 1970 (The New York Times, Oct. 14, 1970, p. 30, col. 3) the U. S. Senate voted 60 to 5 to denounce that report and reject its findings, while Billy Graham castigated it as “one of the worst, most diabolical reports ever made by a Presidential commission." On October 24,1970, President Nixon condemned the report as “ morally bankrupt ” and charged the Commission had “ performed a disservice”. (New York Times, Oct. 25, 1970, col. 8, p. 1).

. Conduct that may lead to sedition (Schenck v. United States, 249 U. S. 47 [1919]); libel (Beauharnais v. Illinois, 343 U. S. 250, 256 [1952]); and “ certain other limited anti-social conduct ” such as “ defamation, injury to business, fraud or invasion of privacy” (United States v. Roth, 237 F. 2d 796, 802, n. 5 [1956]), are also exceptions.

. Referring to Russia in a world broadcast, Oct. 1, 1939.

. (Jacobellis v. Ohio, 378 U. S. 184, 199, supra; United States v. Klaw, 350 F. 2d 155, 167-168, supra; United States v. A Motion Picture Film Entitled “I Am Curious-Yellow”, 404 F. 196, 200 [1968]; People v. Bunis, 23 Misc 2d 156, 158 [1960].)

. The definitions are as varied as the feathers of a peacock. For example, obscene material is that which excites “ lustful and lecherous desire ” (People v. Eastman, 188 N. Y. 478, 480, 489 [1907]); it deals with sex in a manner appealing to prurient interest, in that, it has a “ tendency to excite lustful thoughts ” (Roth v. United States, 354 U. S. 476, 487, supra) ; it tends “ to stir sex impulses or lead to sexually impure and lustful thoughts.” (United States v. One Book Called “ Ulysses”, 5 F. Supp. 182, 184, supra; Roth, supra, p. 487, n. 20). Justice Stewart can’t define the term, as he understands it, but he can recognize it, he says, when he merely sees it. (Jacobellis v. Ohio, 378 U. S. 184, 197, supra.)

. Mr Justice Brennan wrote the Both opinion, joined by Justices Frankfurter, Burton, Clark and Whittaker.

. See n. 18 above.

. Ginzburg v. United States (383 U. S. 463) was also handed down on that day. It is not here discussed; it involved the issue of pandering, not here relevant.

. In 1962, “ patent offensiveness ” was first applied as a new ingredient of the test. In Manual Enterprises v. Day (370 U. S. 478, 486) Justice Harlak made that declaration for the majority: “ Obscenity under the federal statute thus requires proof of two distinct elements: (1) patent offensiveness; and (2) ' prurient interest ’ appeal. Both must conjoin * * * In most obscenity eases, to be sure, the two elements tend to coalesce, for that which is patently offensive will also usually carry the requisite ‘ prurient interest ’ appeal.” He further stated his understanding of “ patent offensiveness ” as that which is offensive on its face (supra, p. 488).

. (See, also, Jacobellis v. Ohio, 378 U. S. 184, 191, supra; Grove Press v. Gerstein, 378 U. S. 577, supra; Larkin v. Putnam’s Sons, supra, 14 N Y 2d 399; People v. Bruce, 31 Ill. 2d 459, 461 [1964].)

. Justice Warren (and Justice Clark) in Jacobellis v. Ohio (378 U. S. 184, 200-201) recognized and commented on the problem: “ It is my belief that when the Court said in B,oth that obscenity is to be defined by reference to ‘ community standards ’, it meant community standards — not a national standard, as is sometimes argued. I believe that there is no provable ‘ national standard ’ and perhaps there should be none.” (See, also, Black, J., dissent in Ginzburg, 383 U. S. 463, 479-480, supra.)

. In granting certiorari, the court limited the writ to exclude consideration of the publication’s obscenity, but rather granted it on the questions whether the Federal obscenity statutes violated the First Amendment; whether they were too vague to meet the requirements of due process under the Fifth, and whether it invaded the powers reserved to the States by the First, Ninth and Tenth Amendments.

. Aside from Gent v. Arkansas and Austin v. Kentucky, which were decided collectively as one decision under Redrup, there have been, to date, some 30 cases decided by the Supreme Court on the basis of Redrup; almost all being reversals of lower courts. Notable exceptions being (G. I. Distrs. v. New York, 389 U. S. 905, cert. den. to People v. G. I. Distrs., 20 N Y 2d 104 [1967]), where the lower court found photos of one embracing, wrestling, spanking, beating or enforced disrobing of a young man; young man manually soap-lathering the genitalia of the other; one trying to seize the genitalia of another; posture suggesting act of pederasty; nude spanking scenes, depicting sadistic assaults. They were designed, the court noted, to portray a full range of sexual behavior between young males from by-play to pederasty. There was no narrative. The lower court had applied the “hard-core” test of Richmond County News (9 N Y 2d 578, supra).
Another exception was Ginsberg v. New York (390 U. S. 629 [1968]) where the majority felt that the “girlie” picture magazines involved, not obscene for adults, but refused to reverse since the case involved a sale to a minor, and “ the power of the state to control the conduct of children reaches heyond the scope of its authority over adults”. (Supra, p. 638.)
The 26 cases in which the Supreme Court reversed on the authority of Redrup, were (the first 13 were all handed down on June 12, 1967, one month after Redrup): (Kenny v. New York, 388 U. S. 440; Friedman v. New York, 388 U. S. 441; Ratner v. California, 388 U. S. 442; Cobert v. New York, 388 U. S. 443; Sheperd v. New York, 388 U. S. 444; Avansino v. New York, 388 U. S. 446; Corinth Pub. v. Wesberry, 388 U. S. 448; Rosenbloom v. Virginia, 388 U. S. 450; A Quantity of Copies of Books v. Kansas, 388 U. S. 452; Mazes v. Ohio, 388 U. S. 453; Schackman v. California, 388 U. S. 454; Potomac News Co. v. United States, 389 U. S. 47; Conner v. City of Hammond, 389 U. S. 48; Central Mag. Sales v. United States, 389 U. S. 50; Chance v. California, 389 U. S. 89; I.M. Amusement Corp. v. Ohio, 389 U. S. 573; Robert-Arthur Mgt. Corp. v. Tennessee ex rel. Canale, 389 U. S. 578; Felton v. City of Pensacola, 390 U. S. 340; Henry V. Louisiana, 392 U. S. 655; Carlos v. New York, 396 U. S. 119; Cain v. Kentucky, 397 U. S. 319 [March, 1970]; Bloss v. Dykema, 398 U. S. 278 [June, 1970] ; Walker v. Ohio, 398 U. S. 434 [June, 1970] ; Hoyt v. Minnesota, 399 U. S. 524 [June, 1970].) “a ray of hope is apparent in Redrup and the Court’s repeated use of it in its per curiam reversals of obscenity judgments * * *. From this development one may infer that a majority of the Court has gathered behind Justice Stewart’s concept equating obscenity with hard-core pornography.” (O. Rogge, The High Gowrt of Obscenity, II, 41 U. Col. L. Rev. 201, 220.)

. Here are a few:
People v. Richmond County News (9 N Y 2d 578, 588, supra); People v. Birch (40 Misc 2d 626 [1963]); United States v. A Motion Picture Film Entitled “ I Am Curious-Yellow” (404 F. 2d 196, 202 [C.C.A. 2d, 1968]); Smith v. California (361 U. S. 147, 165, supra). In his dissent, Justice Frankfurter in West Virginia State Bd. of Educ. v. Barnette (319 U. S. 624, 647 [1943]) reminded the judiciary, generally, of its responsibility in avoiding “ private notions ”, when he said: “As a member of this Court I am not justified in writing my private notions of policy into the Constitution, no matter how deeply I may cherish them or how mischievous I may deem their disregard. * * * It can never be emphasized too much that one’s own opinion about the wisdom or evil of a law should be excluded altogether when one is doing one’s duty on the bench. The only opinion of our own even looking in that direction that is material is our opinion whether legislators could in reason have enacted such a law.”

. Nor would “ the law M * * hold the crowd to the literary or artistic People v. Richmond County News (9 N Y 2d 578, 588, supra); People v. Birch Fuld quoting Justice Cardozo) . Chief Judge Desmond, in his dissent, also alludes to judicial courage and intellectual honesty, when he says in Larkin v. Putnam’s Sons (14 N Y 2d 399, 406 [1964]) : “ It is today’s fashion to find literary values in any sexy writing and to ridicule as blue-nosed prying Puritans and enemies of art and literature-all those who try to preserve a modicum of public decency in our society.”

. One defense witness characterized Zap No. 4 as “ underground material.” I have yet to find a satisfactory definition of the term, except to suggest it is material, which, like the bat, may not see the light of day, lest it destroy itself in the bright sunshine of examination. Further, Vicki Hodgetts, writing for “New York” magazine (not to be confused with " The New Yorker”), issue of June 22, 1970, calls Robert Crumb, apparently one of the founders and owners of Zap Comix and a prime artist in Zap No. 4, as “ America’s Best-Loved Underground Cartoonist ”, and a member of the “ new cycle of vulgar cartoonist ”, whose mother describes his comics as “ vulgar, vulgar, vulgar, vulgar, vulgar.” She quotes Crumb as saying, “ sometimes I think I’m crazy. I have these weird fantasies. If I didn’t put them down in my comics, I don’t know what I’d do.”

. The New York Times of February 22, 1970 (p. 1, eol. 6) states that “ The annual volume of pornography business is difficult to estimate. Some observers have said $2-billion, most experts put the figure closer to $500-million. But what is not disputable is the industry’s tremendous recent growth.” “ Adult book stores” have enjoyed an extraordinary growth in New York City, this news report claims, and produces, along with Los Angeles, all the pornography in the country. There were, as of the date of the article, 200 such book stores in New York City.
In its issue of October 2, 1970, the same newspaper reported (p. 37, eol. 7), “ Live public performances of sexual acts are being presented to paying audiences at a number of places in Manhattan :;i * * The shows, which involve both heterosexual and lesbian couples, challenge the explicitness of the voyeuristic tableaus that flourished in pre-Castro Cuba and are now legal in Copenhagen.”